GEORGE D. LADAS and LOIS H. LADAS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ladas v. Commissioner
Docket No. 2798-72
United States Tax Court
T.C. Memo 1976-64; 1976 Tax Ct. Memo LEXIS 337; 35 T.C.M. (CCH) 283; T.C.M. (RIA) 760064; March 8, 1976, Filed *337 In 1960 petitioner invested $40,000 in a partnership with its principal place of business in Colombia, South America and advanced $10,000 to a coworker thereby enabling him to do the same. Petitioner deducted as a loss $7,500 of this investment on his 1962 tax return. He then, having received no return on his investment and having been unsuccessful in his efforts to obtain repayment of the loan, claimed a $42,500 abandonment loss deduction on his 1968 tax return. Even though he suffered an admitted loss petitioner has fallen victim to a maze of provisions dealing with the timing of, and extent of, deductible losses. Held, petitioner has failed to prove the year in which the debt became worthless. Held further, petitioner has failed to prove either the year in which the partnership abandoned its operations or his basis therein during any of the years in issue. Held further, petitioner's alternative claim to a theft loss deduction must be denied since he has failed to demonstrate either that a crime occurred under state law or the amount of the loss to which he would be entitled had such crime been established. Donald B. Black, for the petitioners. Edward B. Simpson, for the respondent. *338 STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined deficiencies in the federal income taxes of George D. Ladas and Lois H. Ladas as follows: Taxpayer
Year
Deficiency
George D. Ladas
1965
$ 640.00
1966
$1,562.00
Lois H. Ladas
1965
$ 640.00
1966
$1,695.00
George D. and Lois H.
1968
$3,903.02
Ladas
The deficiencies stem from respondent's disallowance of an abandonment loss claimed on petitioners' 1968 joint return and net operating loss deductions allowed to petitioners for the calendar years 1965 and 1966 which were based upon a 1968 operating loss produced solely by the aforenoted abandonment loss deduction. The issues for decision are: (1) whether petitioners are entitled to a deduction for an abandonment loss, or alternatively a theft loss, in either 1968 or 1970, based upon a still unrecovered investment in a partnership by petitioner George Ladas; (2) whether petitioners, if they are so entitled, have correctly computed the net operating loss deductions for the calendar years 1965 and 1966; (3) and whether petitioners are entitled to a bad debt deduction for the calendar year 1968. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The *339 stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioners George D. Ladas (hereinafter petitioner) and Lois H. Ladas (hereinafter Mrs. Ladas), husband and wife, were residents of San Rafael, California at the time they filed their petition herein. For the calendar years 1965, 1966, and 1967 petitioners filed timely separate income tax returns although they were married during those years. For the calendar years 1968 and 1970 they filed timely joint federal income tax returns. In 1960 Vernon Ruble (hereinafter Ruble) and petitioner were employed by the same stockbrokerage firm. Sometime prior to August 26, 1960 Ruble informed petitioner that an influential Colombian citizen, Arturo F. Marquez (hereinafter Marquez), was in California to attract investment capital with which to develop certain properties he owned. At a meeting held in Ruble's home Marquez proffered a proposal for the exploitation of natural resources situated on land he held in South America. In addition to Marquez, Ruble, and petitioner, this meeting was attended by Kenneth Hooper (hereinafter Hooper) and W. Strother Jones (hereinafter Jones), two personal *340 acquaintances of petitioner. [1]
Following various negotiations, in September, 1960 Marquez, Jones, Ruble, Hooper, and petitioner entered into a partnership agreement, the pertinent provisions of which are set forth below. AGREEMENT OF LIMITED PARTNERSHIP THIS AGREEMENT, entered into this day of , 1960, by and between ARTURO F. MARQUEZ, VERNON RUBLE, W. STROTHER JONES, KENNETH HOOPER and GEORGE LADAS, hereafter referred to by their surnames. RECITALS OF FACT
1. MARQUEZ, a citizen of Colombia, is the owner of certain parcels of land in Colombia, and he also holds options to purchase and timber-cutting rights in and to certain other parcels. The properties involved and the respective interests of Marquez are more particularly set forth in Exhibit "A" hereto, and references throughout this agreement to the "Marquez Properties" shall mean all the real or immovable property owned by MARQUEZ in fee simple absolute (defined in paragraph 43 hereof) and those properties in which MARQUEZ holds any interest by way of option agreements or otherwise. *341 * * * RUBLE, JONES, HOOPER and LADAS own, as tenants in common, a one-half undivided interest in and to that real property described in Exhibit "B" hereto. That property will hereafter be referred to as the "Colorado property". The interests of each of the tenants in common in the Colorado property is as follows: RUBLE
40%
JONES
20%
HOOPER
20%
LADAS
20%
* * *
3. There has been prepared for RUBLE and MARQUEZ the following limited partnership agreement. To the limited partnership will be contributed all the owned properties of MARQUEZ and the Colorado property. In addition Marquez will assign to the limited partnership all of his interests in and to the optioned properties. The parties other than MARQUEZ will contribute One Hundred Thousand Dollars ($100,000.00) in cash either directly to the limited partnership or by way of payment of organizational and other expenses of the limited partnership. Such payment of expenses will be regarded as contributions by parties other than MARQUEZ. NOW, THEREFORE, IT IS AGREED: * * *
3. Firm name: The name under which the limited partnership shall conduct its business shall be: MARQUEZ & COMPANY (MARCO) 4. Principal place of business and branch offices: The *342 principal place of business of the limited partnership shall be in Tumaco, Colombia, where administrative operations shall be conducted. * * * 5. Duration: The term for which the limited partnership is to exist shall be ten (10) years from the date hereof or so long thereafter as timber or minerals exist or can be cut or extracted from any real or immovable property owned by the limited partnership * * *. 6. Business purpose. The limited partnership shall take title to and obtain assignments of the Marquez and Colorado properties. The business of the limited partnership shall include the cutting of timber and the extracting of minerals from the Marquez and Colorado properties and otherwise receiving the rents, issues and profits from said properties. 7. Names and places of residence of general and limited partners:
General Partners
ARTURO E. MARQUEZ
Tumaco, Colombia
VERNON J. RUBLE
795 Burnett Avenue
San Francisco, California
Limited Partners
W. STROTHER JONES
53 Van Winkle Drive
San Anselmo, California
KENNETH HOOPER
4051 Warren Avenue
Sacramento, California
GEORGE LADAS
405 Serrano Drive
Apartment 3H
San Francisco, California
SECTION II CAPITAL CONTRIBUTIONS, PROFITS AND LOSSES
8. Capital contributions: *343 (A) General partners: (1) ARTURO E. MARQUEZ hereby contributes to the capital of the limited partnership all his right, title and interest in and to the owned and optioned properties described in Exhibit "A" hereto, which, for the purposes of this contract, shall have the agreed value of Six Hundred Thousand Dollars ($600,000.00). (2) VERNON J. RUBLE has contributed to the capital of the limited partnership Forty Thousand Dollars ($40,000.00) in cash and his forty percent (40%) interest in the Colorado property, which, for purposes of this agreement, shall have the agreed value of Forty Thousand Dollars ($40,000.00). (B) Limited partners: The limited partners have each contributed to the capital of the limited partnership Twenty Thousand Dollars ($20,000.00) cash, and their respective twenty percent (20%) interests in and to the Colorado property, each of which, for purposes of this agreement, shall have the agreed valuue of Twenty Thousand Dollars ($20,000.00). Each partner shall be deemed to own that percentage of all partnership movable and immovable property and other property and interests of the partnership as appear after their respective names, and, as to each partner, that *344 percentage will hereafter be referred to as his "percentage of ownership". ARTURO E. MARQUEZ
75%
VERNON J. RUBLE
10%
KENNETH HOOPER
5%
W. STROTHER JONES
5%
GEORGE LADAS
5%
* * * The original capital accounts of each of the general and limited partners shall be as follows: ARTURO E. MARQUEZ
$600,000.
VERNON J. RUBLE
$ 80,000.00
KENNETH HOOPER
$ 40,000.00
W. STROTHER JONES
$ 40,000.00
GEORGE LADAS
$ 40,000.00 Hereinafter the partnership will be referred to as Marco. [2]
Pursuant to the partnership agreement petitioner paid $50,000 to Ruble by three checks. [3] *345 It was petitioner's understanding that $40,000 of this amount represented his investment in Marco and that the remaining $10,000 represented a personal loan to Ruble designed to enable Ruble also to invest in Marco. [4] Petitioner has never received a return on his investment and the loan to Ruble has not been repaid. During the years 1960 through 1968 petitioner frequently questioned Ruble about the status of Marco. The responses, however, were apparently unenlightening and petitioner was unable to obtain any information with respect to Marco in a year other than 1962. [5] In that year he became aware of a shipment of logs to New Orleans and was given a financial statement by Ruble upon which he based a $7,500 loss that he claimed (and was allowed) on his 1962 tax return. During these years petitioner also approached Ruble from time to time concerning repayment of the $10,000 loan but was continuously rebuffed by Ruble who claimed he lacked sufficient funds with which to liquidate the debt. Petitioner then proceeded to investigate Ruble's financial status and was informed that one Louis Callison at one time held a judgment against Ruble (which has since been assigned to Donald *346 B. Black) and that efforts in 1963 and 1964 to obtain satisfaction thereof proved fruitless. At the time the Marco partnership agreement was executed petitioner was married to Electra Ladas. They were divorced in 1960 or 1961 but petitioner retained the interest in Marco and the right to repayment of the loan as his separate property. They continued to be his separate property after his marriage to the present Mrs. Ladas. Petitioner, on his separate federal income tax returns for the calendar years 1965, 1966 and 1967, reported the following: 1965
1966
1967
Adjusted gross income
$8,500
$15,296
$10,967
Capital loss
1,000
1,000
1,000
Itemized deductions
3,561
2,645
3,869
Personal exemptions
1,200
1,200
1,200
Taxable income
3,739
11,451
5,898
Tax liability
640
2,654
1,108
Mrs. Ladas, on her separate federal income tax returns for the calendar years 1965, 1966, and 1967, [6] reported the following: 1965
1966
1967
Adjusted gross income
$8,500
$15,296
$10,967
Capital loss
1,000
1,000
1,000
Itemized deductions
3,561
2,643
3,867
Personal exemptions
1,200
1,200
600
Taxable income
3,739
11,452
6,500
Tax liability
640
2,655
1,255
In *347 1968 petitioner's accountant instituted an investigation of Marco and told petitioner that the report of said inquiry revealed that the Marquez properties were never transferred to Marco. [7] Petitioners then claimed on their 1968 joint return an abandonment loss in the amount of $42,500 which represents the difference between the $50,000 expended by petitioner in 1960 and the $7,500 deduction allowed to petitioner in 1962. This deduction produced an operating loss for 1968 in the amount of $25,524. [8]
On or before April 15, 1969 petitioners separately filed applications with the Internal Revenue *348 Service for tentative carryback adjustments to the taxable years 1965 and 1966 based upon the net operating loss shown on their 1968 joint return. On said applications they treated the loss as being attributable one-half to each spouse and computed the carryback adjustments as follows: COMPUTATION OF NET OPERATING LOSS DEDUCTION George D.
Lois H.
Ladas
Ladas
Statutory loss per 1968 joint return
$12,762
$12,762
Less deduction for exemptions
1,200
600
Carryback to 1965
$11,562
$12,162
Note: Nonbusiness income exceeded
Nonbusiness expenses
Adjusted gross income for 1965, per
$ 8,500
$ 8,500
return
Add - capital loss deduction allowed
1,000
1,000
Revised adjusted Gross Income
$ 9,500
$ 9,500
Less itemized deductions per return
3,561
3,561
(no adjustment based on revised
adjusted gross incomes necessary)
Taxable Income for 1965, as Revised
$ 5,939
$ 5,939
Less net operating loss for 1968
11,562
12,162
Amount of Net Operating Loss to
be Carried to 1966
$ 5,623
$ 6,223 Petitioners received tentative carryback loss refunds as follows: 1965
1966
George D. Ladas $640
$1,562
Lois H. Ladas
640
1,695
On their 1970 return [9] petitioners reported the following: Wages, George L , Lois Ladas 8,936.68 Interest 281.37 Other income 249.41 Capital *349 loss 1,000.00 Employee business expenses, George Ladas 3,632.35 Employee business expenses, Adjusted deductions 7,875.11 Itemized deductios 9,938.45 Taxable income Tax liability In his notice of deficiency respondent disallowed the abandonment loss claimed on petitioners' 1968 jointreturn. Hence, he also determined that petitioners were not entitled to any net operating loss deductions for the years 1965 and 1966. We must decide the correctness of respondent's determinations. OPINION On their 1968 joint return petitioners claimed a $42,500 ordinary loss described as "Abandonment Loss-Land & Timber Interests in Colombia, South America." They concede on brief, however, that $10,000 of this amount represents an unpaid loan advanced to Ruble in 1960. It is their position that they are entitled to a bad debt deduction in 1968 in the amount of $10,000 and to an abandonment loss in the amount of $32,500 in either 1968 or 1970 (the year in which Marco was to cease operations pursuant to the aforementioned partnership agreement). As an alternative to the abandonment loss deduction petitioners claim entitlement *350 to a $32,500 embezzlement loss deduction in 1968, asserting that they discovered "the swindle" in that year. Respondent disputes these contentions asserting the following arguments: (1) petitioners' claim to a bad debt deduction must be denied since petitioners have failed to establish that the debt became worthless, or if worthless, that it became so in 1968; (2) petitioners' abandonment loss deduction must be disallowed due to petitioners' failure to prove either the year in which Marco abandoned its operations or, assuming arguendo that there was in fact an abandonment, the amount of any loss occasioned thereby; and (3) petitioners' claim to a deduction for an embezzlement loss should be denied for the reason that petitioners have failed to show that any crime took place under California law and have not established the amount of the alleged embezzlement loss. We turn first to the bad debt issue. Since we have found that petitioner was at no time engaged in the trade or business of lending money, the provision governing this issue is subsection (d) of section 166, I.R.C. of 1954[10] which, in effect, provides for a short term capital loss deduction for nonbusiness debts that have *351 become worthless within the taxable year. Obviously, the question of worthlessness is one of fact, and it is incumbent upon petitioners to demonstrate by objective evidence that the debt had reached that status in 1968. Henry C. Mueller,60 T.C. 36 (1973), remanded on another issue, 496 F. 2d 899 (5th Cir. 1974). More specifically, petitioners must prove that the Ruble debt had value at the close of 1967 and became worthless by the end of 1968. Herbert W. Dustin,53 T.C. 491 (1969), affd. 467 F. 2d 47 (9th Cir. 1972). We agree with respondent that petitioners have failed to sustain their burden of proof on this issue. The sole evidence in this connection was petitioner's testimony with respect to statements made to him by third parties pertaining to Ruble's financial status. Such testimony, being hearsay, was admitted for the sole purpose of establishing petitioner's understanding of the relevant events and is not competent to prove as fact the value of the Ruble debt at any time. Furthermore, even if it were so competent, such evidence as was received on this issue indicates that the *352 Ruble debt probably became worthless at some time prior to 1968. Stripped to the bare essentials, all that we have before us is petitioner's unsupported opinion that the debt became worthless in 1968. Such opinion being insufficient to support a deduction for worthlessness, petitioners' claim thereto is hereby denied. Orrin W. Fox,50 T.C. 813 (1968), affd. per curiam 25 A.F.T.R. 2d 70-891 (9th Cir. 1970). Turning next to petitioners' abandonment theory, section 165(a), the relevant statutory provision since petitioner's investment was unquestionably a "transaction entered into for profit" within the meaning of section 165(c)(2), provides: (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. [11]
Respondent, in his notice of deficiency, determined that petitioners had failed to establish both the amount of the abandonment loss, if any, and the year in which such loss was incurred. Hence, petitioners bear the burden of proving the year in which Marco abandoned its operations and the amount of the loss incurred as a consequence of such abandonment. Welch v. Helvering, 290 U.S. 111 (1933). *353 We agree with respondent that petitioners' efforts to make the requisite showing have fallen short of the mark. Apart from petitioner's testimony that Marco shipped logs to New Orleans in 1962, the record is barren of any evidence pertaining to Marco's operations during the period 1960 through 1970. The dearth of evidence presented on this issue precludes us from finding that, within the meaning of section 708, [12] Marco ceased its operations during either 1968 *354 or 1970. We are thus unable to make a judgment that any loss on his investment in the partnership occurred in those years. Furthermore, assuming that Marco did terminate in either 1968 or 1970, petitioners have failed to establish the amount of the loss to which they would be entitled. Pursuant to section 165(b) and section 1.165-1(c)(1), Income Tax Regs., the measure of such loss would be the adjusted basis of petitioner's interest in Marco as determined under section 705 which provides: SEC. 705. DETERMINATION OF BASIS OF PARTNER'S INTEREST. (a) General Rule.--The adjusted basis of a partner's interest *355 in a partnership shall, except as provided in subsection (b), be the basis of such interest determined under section 722 (relating to contributions to a partnership) or section 742 (relating to transfers of partnership interests)-- (1) increased by the sum of his distributive share for the taxable year and prior taxable years of-- (A) taxable income of the partnership as determined under section 703(a), (B) income of the partnership exempt from tax under this title, and (C) the excess of the deductions for depletion over the basis of the property subject to depletion; and (2) decreased (but not below zero) by distributions by the partnership as provided in section 733 and by the sum of his distributive share for the taxable year and prior taxable years of-- (A) losses of the partnership, and (B) expenditures of the partnership not deductible in computing its taxable income and not properly chargeable to capital account. Manifestly, for the abandonment to have occurred in 1968 (or 1970), Marco must have continued its operations within the meaning of section 708 until 1968 (or until 1970), and it is only reasonable to assume that section 705 adjustments to petitioner's basis in Marco *356 resulted therefrom. The record, however, is wholly silent with respect to Marco's activities after 1962, and we have received no evidence that would enable us to make a determination of petitioner's basis in Marco in 1968 or in 1970. Finally, we address ourselves to petitioners' contention that they are entitled to a deduction for a theft loss in 1968, the year in which they allege to have discovered such loss. [13] *357 Apparently their theory is that Marquez made false representations to petitioner thereby inducing him to invest in Marco. We have, on prior occasions, sustained theft losses in cases wherein false representations induced a taxpayer to part with his money or property, and it is well settled that the taxpayer need not show a conviction for theft in order to substantiate the validity of his claim to a theft loss deduction. Lester I. Paine, 63 T.C. 736 (1975), affd. per curiam 523 F. 2d 1053 (5th Cir. 1975); Paul C. F. Vietzke,37 T.C. 504 (1961). However, a precondition for such deduction is that the activities in question constitute a crime under the law of the state where the loss was sustained. Lester I. Paine,supra; Michele Monteleone,34 T.C. 688 (1960). Section 484 of the California Penal Code, in pertinent part, states: Sec. 484. Theft defined (a) Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him, or who shall knowingly and designedly, by any lse or fraudulent representation or prestense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains the labor or service of another, is guilty of theft. Petitioners must, therefore, demonstrate that Marquez defrauded petitioner of his investment in Marco and that he did so knowingly. We think they have failed to make such a showing. Although the record is sparse, it is clear that for a crime *358 to have been committed under the aforenoted provision, Marquez must have "pocketed" petitioner's investment with no intention of parting with his own properties and he must in fact have failed purposely to consummate the bargained-for transfer. While we have reservations with respect to whether the transfer was ever made, the record contains no evidence, whatsoever, that Marquez did not transfer his properties to Marco. In this connection we note that petitioner testified that he was told that Marquez never deeded his properties to Marco. As we previously stated such testimony, being hearsay, is not competent to establish as fact that no transfer was made. Absent such fact we are compelled to hold that petitioners have failed to prove that any loss they did incur was due to theft. [14] *359 We are most sympathetic with petitioner's plight since it is an accepted fact that he did indeed suffer a loss on his investment. However, he has fallen into a maze of provisions dealing with the timing of, and extent of, deductible losses. Whether there might have been a way out is impossible for us to say, but we find no leads in the record before us. Since we have held that petitioners are not entitled to the deductions at issue in either 1968 or 1970 we need not consider whether their computation of the net operating loss deductions was correct. Decision will be entered for the Respondent.
Footnotes
1. Apparently, the only other meeting petitioner had with Marquez was in San Francisco in the late 1960's. This meeting was also attended by Hooper and Jones.↩
2. Despite the language in the partnership agreement other portions of the record make it unclear which of the aforenoted individuals owned the "Colorado property."↩
3. The maker of one check, in the amount of $25,000, was petitioner's mother Antigone Ladas. Although the designated payee on the check was Ruble, this check in fact represented a loan to petitioner and has been repaid in full. 4. Petitioner has never been in the business of lending money.↩
5. On one other occasion petitioner, Hooper and Jones were told of a prospective investment in Marco by a New York firm. The address of the firm which was given to them by Ruble turned out to be that of a Chinese laundry.↩
6. The parties have agreed that for purposes of this case petitioners' respective 1967 tax returns are correct as filed.↩
7. The report itself was not offered in evidence and petitioner's testimony with respect to its contents was admitted solely for the purpose of establishing petitioner's understanding of what had occurred. The testimony is not competent to establish that Marco did not receive title to the Marquez properties. ↩
8. Petitioners' return for 1968 also showed the following: ↩
Income, George Ladas
$ 8,204
Income, Lois Ladas
8,821
Other income: Net Short term capital gains
11,591
Dividends
180
Hanson properties
622
Dividend
25
Adjusted gross income
(13,057)
Itemized deductions
10,667
Personal exemptions
1,800
Taxable income
(25,524)
9. The parties have agreed that for purposes of this case this return is correct as filed.↩
10. All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.↩
11. Section 1.165-2(a), Income Tax Regs, promulgated with respect to sec. 165 states: (a) Allowance of deduction. A loss incurred in a business or in a transaction entered into for profit and arising from the sudden termination of the usefulness in such business or transaction of any non-depreciable property, in a case where such business or transaction is discontinued or where such property is permanently discarded from use therein, shall be allowed as a deduction under section 165(a)↩ for the taxable year in which the loss is actually sustained. For this purpose, the taxable year in which the loss is sustained is not necessarily the taxable year in which the overt act of abandonment, or the loss of title to the property, occurs.
12. SEC. 708 CONTINUATION OF PARTNERSHIP. (a) General Rule.--For purposes of this subchapter, an existing partnership shall be considered as continuing if it is not terminated. (b) Termination.-- (1) General rule.--For purposes of subsection (a), a partnership shall be considered as terminated only if-- (A) no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership, or (B) within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits.↩
13. Sec. 165(c)(3)is the governing provision with respect to this contention. Insofar as the timing of such a deduction is concerned, sec. 165(e)↩ controls and provides that a loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers the loss.
14. Moreover, assuming that a theft did occur, petitioners have for the same reason failed to prove the amount of the loss to which they are entitled. On the facts presented the consideration for petitioner's investment was the land Marquez was to transfer to Marco pursuant to the partnership agreement. Hence the measure of the loss would be the difference between the value of the land Marquez was obligated to transfer to Marco and the value of the land he did in fact transfer thereto. Since we do not know what properties Marquez did or did not transfer, we have no way of determining the amount of any loss to which petitioners might be entitled. For a similar failure of proof see Estate of E.E. DeRossett and Estate of Julia DeRossett,T.C. Memo. 1975-123↩.