*Decisions will be entered under Rule 155.*

LESTER I. PAINE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2461–71.     Filed March 31, 1975.

*Ralph Freedson,* for the petitioner.
*James N. Mullen,* for the respondent.

OPINION

WILBUR, *Judge:* Respondent has determined a deficiency of $19,371 in petitioner's 1966 Federal income tax. The sole issue

presented is whether the petitioner incurred a theft loss within the meaning of section 165(c)(3)[1] in 1966.

All the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, are found accordingly.

During the calendar year 1966 and at the time the petition was filed petitioner resided in Houston, Tex. Petitioner filed an individual income tax return for the taxable year 1966 with the district director of internal revenue at Austin, Tex. During the taxable year 1966 petitioner was a stockbroker employed by Paine, Webber, Jackson & Curtis (hereinafter Paine, Webber) in Houston, Tex.

As of August 25, 1966, and at the end of the taxable year 1966, petitioner owned a total of 750 shares of Westec stock. Seven hundred of these shares were owned in his name and 50 were held for his beneficial interest in the name of Paine, Webber. Petitioner bought his 750 shares of Westec on the open market through Paine, Webber or by means of a joint venture with Robert Johnson.

The basis of the 750 shares of Westec owned by petitioner is as follows:

| Number of shares | Basis |
|---|---|
| 200 | $12,740.60 |
| 500 | 24,906.03 |
| 50 | 3,044.71 |
| 750 | 40,691.34 |

Until August 25, 1966, stock of Westec Corp. was bought and sold on the American Stock Exchange. On August 25, 1966, the Securities and Exchange Commission (hereinafter S.E.C.) suspended trading in Westec stock because of insider manipulation of its market price. Pursuant to a series of conforming suspension orders trading in Westec stock remained suspended until May 4, 1969, when the S.E.C. canceled its suspension order. Trading in Westec was suspended in Texas in March 1967. The State Securities Board permitted trading in Westec to resume on May 5, 1969. The stock of Westec did not become worthless during the taxable year 1966.

Investigations uncovered substantial misstatements and fraudulent statements as to the true earnings and profits of

---

[1] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.

Westec; as to mineral discoveries that had been announced by Westec; as to acquisitions or sales of properties reported by Westec which had not occurred; as to false earnings projections; and as to other fraudulent statements and transactions that had been reported as being completed but had not occurred. As a specific example, the earnings per share for Westec for the year 1965 were stated in the Westec annual report as being equal to $1.15 per share but it was determined that a number of the transactions certified and reported in arriving at the net earnings of $1.15 per share were fraudulent or misstated. Furthermore, substantial mineral discoveries which were announced as being made by Westec in Colombia were, in fact, not made. Additionally, earnings projections of $2.65 per share for the year 1966 were in fact overstated. These investigations also uncovered numerous other fraudulent representations, statements, public announcements, reported earnings figures, projected earnings figures, proposed acquisitions, and mergers, most of which were made publicly.

Various criminal indictments were returned against principal officers and employees of Westec, including James W. Williams, chairman of the board of Westec (hereinafter Williams), Ernest M. Hall, Jr., president of Westec (hereinafter Hall), Malcolm G. Baker, Jr. (hereinafter Baker), and Lester L. Lilley (hereinafter Lilley) for alleged violations of the Federal securities laws. As a result of these indictments Hall pleaded guilty to conspiracy to violate the Federal securities laws and the mail fraud statute. Baker and Lilley pleaded guilty to employing a manipulative and deceptive device during the spring of 1966 in the purchase and sale of Westec stock, creating a false appearance of active trading that raised its price. Williams pleaded not guilty but was found guilty of conspiracy to violate the Federal securities laws and the mail fraud statute. He was also found guilty of mail fraud.

On September 26, 1966, Westec filed a voluntary petition with the United States District Court for the Southern District of Texas for a reorganization of the company pursuant to chapter X of the Bankruptcy Act. During the period in which trading was suspended Westec continued limited business activity in the chapter X reorganization under the strict control of its trustee. Pursuant to the trustee's plan of reorganization, Westec was reorganized and is currently in business as Tech-Sym Corp.

Petitioner filed a proof of stock interest. Paine, Webber also submitted a proof of stock interest claiming ownership in 5,950 shares. On October 4, 1972, the trustee transmitted to Paine, Webber a stock certificate in Tech-Sym Corp. for the 50 shares in which petitioner owned a beneficial interest. This stock certificate was issued to petitioner. On March 1, 1974, petitioner submitted to the trustee in bankruptcy an affidavit of lost escrow certificate. Pursuant to the affidavit the trustee in bankruptcy issued to petitioner a stock certificate in Tech-Sym for 700 shares.

Petitioner contends that he is entitled to a theft loss deduction under section 165(c)(3) [2] for the amount of money he invested in

---

[2] The relevant language of sec. 165 provides:

SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

(b) AMOUNT OF DEDUCTION.—For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

* * *

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100. For purposes of the $100 limitation of the preceding sentence, a husband and wife making a joint return under section 6013 for the taxable year in which the loss is allowed as a deduction shall be treated as one individual. No loss described in this paragraph shall be allowed if, at the time of filing the return, such loss has been claimed for estate tax purposes in the estate tax return.

* * *

(e) THEFT LOSSES.—For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss.

(f) CAPITAL LOSSES.—Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212.

(g) WORTHLESS SECURITIES.—

(1) GENERAL RULE.—If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.

(2) SECURITY DEFINED.—For purposes of this subsection, the term "security" means—

(A) a share of stock in a corporation;

(B) a right to subscribe for, or to receive, a share of stock in a corporation; or

(C) a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government or political subdivision thereof, with interest coupons or in registered form.

750 shares of Westec stock.[3] Petitioner's theory is that the corporate officers made false representations regarding the financial status of the corporation to shareholders, prospective shareholders, and the public. These misrepresentations, petitioner alleges, induced him to purchase stock in Westec at a time when the price of the stock was artificially inflated.[4]

Theft loss deductions have been sustained by this Court in numerous cases in which the theft consisted of false representations made to the petitioner which induced him to part with his money or property. *Perry A. Nichols*, 43 T.C. 842 (1965); *Michele Monteleone*, 34 T.C. 688 (1960); *Morris Plan Co. of St. Joseph*, 42 B.T.A. 1190 (1940). Whether or not the activity constitutes a theft is determined by the law of the State where the loss was sustained. *Edwards v. Bromberg*, 232 F.2d 107 (C.A. 5, 1956). However, an actual conviction for theft under State law is not a prerequisite for a theft loss deduction. *Paul C. F. Vietzke*, 37 T.C. 504 (1961).

The parties agree that whether or not the activities in question constitute a theft must be determined by reference to Texas law. Although it is clear that the corporate officers engaged in illegal activities, petitioner has failed to prove a theft occurred under the provisions of the Texas Penal Code applicable to the period here involved.[5] These code provisions reflect the atavistic formalisms of the common law and statutory development of larceny and related crimes. The provisions relating to theft define

---

[3] Petitioner initially deducted $49,936.02 on his 1966 return as a theft loss attributable to 815 shares with a basis of $49,936.02. He now concedes that, assuming he is entitled to a theft loss, he owned only 750 shares of Westec with a cost basis of $40,691.34.

[4] There is some ambiguity in petitioner's theory. In his return, petitioner attached a statement simply stating that the amount invested in Westec stock up until trading was suspended was claimed as a theft loss. In his original brief petitioner appears to claim a loss for a decline in value of his stock resulting from the officers' "fraudulent scheme in destroying Westec Corporation and destroying the financial worth of Westec Corporation and the value in Westec stock." Petitioner states in his reply brief that: "petitioner apparently claims that such a purchase is a theft to the extent that the inflated value exceeded the actual fair market value at the date of purchase." However, as subsequently discussed, no evidence was introduced as to the date of purchase or as to the "actual" value of the stock, although it was stipulated that it did not become worthless in 1966.

[5] In 1973 (effective Jan. 1, 1974) a comprehensive new penal code was enacted by the Texas Legislature and the provisions herein discussed were repealed. See fn. 12 *infra*.

common law larceny,[6] including larceny by trick or false pretext,[7] while other provisions include embezzlement[8] and define "swindling" to incorporate and broaden the offense of obtaining property by false pretense.[9] These and other provisions filled in the definitional gaps in the traditional offenses, and broadened and adapted them to contemporary circumstances.

The leading case of *Edwards v. Bromberg,* 232 F.2d 107, 111 (C.A. 5, 1956), on which both parties place reliance, instructs that "the exact nature of the crime, whether larceny or embezzlement, of obtaining money under false pretenses, swindling or other wrongful deprivations of the property of another, is of little importance so long as it amounts to theft." The term "theft," as used in section 165(c)(3), is broadly defined:

the word "theft" is not like "larceny", a technical word of art with a narrowly defined meaning but is, on the contrary, a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property *to the use of the taker,* particularly including theft by swindling, false pretenses, and any other form of guile. [*Edwards v. Bromberg, supra* at 110; fn. omitted; emphasis added.] [10]

The initial difficulty petitioner confronts is that there is no evidence that the misrepresentations in question were made by the corporate officers with the specific intent of obtaining,

---

[6] Texas Penal Code art. 1410 (repealed 1974) provided:

"Theft" is the fraudulent taking of corporeal personal property belonging to another from his possession, or from the possession of some person holding the same for him, without his consent, with intent to deprive the owner of the value of the same, and to appropriate it *to the use or benefit of the person taking.* [Emphasis added.]

[7] Texas Penal Code art. 1413 (repealed 1974) reads:

The taking must be wrongful, so that if the property came into the possession of the person accused of theft by lawful means, the subsequent appropriation of it is not theft, but if the taking, though originally lawful, was obtained by any false pretext, or with any intent to deprive the owner of the value thereof, and appropriate the property *to the use and benefit of the person taking,* and the same is so appropriated, the offense of theft is complete. [Emphasis added.]

[8] Texas Penal Code art. 1534 (repealed 1974).

[9] Texas Penal Code art. 1545 (repealed 1974) reads:

"Swindling" is the acquisition of any personal or movable property, money, goods, services, or instrument of writing conveying or securing a valuable right, or any other thing of value, by means of some false or deceitful pretense or device, or fraudulent representation, *with intent to appropriate the same to the use of the party so acquiring,* or of destroying or impairing the right of the party justly entitled to the same. [Emphasis added.]

Additionally, art. 1548 (repealed 1974) provides:

It is not necessary in order to constitute the offense of swindling, that any benefit shall accrue to the person guilty of the fraud or deceit, nor that any injury shall result to the person intended to be defrauded, if it is sufficiently apparent that there was a wilful design to receive benefit or cause an injury.

[10] See also sec. 1.165-8(d), Income Tax Regs.

acquiring, or securing any property or valuable right from petitioner and with the specific intent of criminally appropriating petitioner's property or right, or destroying petitioner's right to enjoyment. Nor did any such result occur. This is a common element of the applicable sections of the Texas Penal Code, set out in the footnotes, that collectively give meaning to the term "theft" as used in section 165(c)(3).[11] Petitioner did not purchase his stock from the persons who made the misrepresentations, but on the open market. There is no evidence that the previous owners of the stock participated in or were even aware of the misrepresentations of Westec's officers. From all that appears in the record they simply engaged in a standard market transaction, completely devoid of any activity amounting to a criminal appropriation of petitioner's property.[12]

Additionally, it is well settled that when a theft is accomplished through false representations, the false representations must have induced the injured party to part with his property. *Cleveland v. State,* 438 S.W. 2d 807 (Tex. Crim. App. 1969); *Womack v. State,* 408 S.W. 2d 119 (Tex. Crim. App. 1967); *Noblitt v. State,* 103 Tex. Crim. 550, 281 S.W. 849 (1926); *Whitley v. State,* 90 Tex. Crim. 503, 236 S.W. 470 (1922). Petitioner has not only failed to produce evidence that he relied on the misrepresentations, but has also failed to show that his loss was related to those misrepresentations. To establish a causal connection between the fraudulent representations and petitioner's purchase, the representations must have been made prior to the purchase. Since the record contains no evidence indicating when the stock was purchased, it is impossible to

---

[11] It is true that art. 1548, *supra* fn. 9, provides that swindling does not require that any benefit accrue to the person guilty of fraud or that any injury result to the person defrauded if there was a wilful design to receive benefit or cause an injury. But in broadening the offense of swindling this section itself makes it clear that there must be a "wilful design" to receive a benefit from or cause an injury to "the person intended to be defrauded." See *Mowrey v. State,* 122 Tex. Crim. 456, 55 S.W. 2d 816 (1932).

[12] In 1973 a new penal code was enacted in Texas, effective Jan. 1, 1974. Texas Penal Code secs. 1–47 (1974), added by Acts of 1973, 63d Leg., ch. 399. Sec. 31.03 relating to theft "encompasses all acquisitive conduct previously made unlawful in several separate offenses." Searcy & Patterson, Practice Commentary following sec. 31.03. The new offense of theft requires unlawful conduct with the intent to deprive the owner of property whereby the actor "obtains the property or exercises control over the property." *Ibid.* In encompassing the various provisions of previous Texas law relating to unlawful acquisitive conduct, the new code sheds light on the meaning of previous law. And the new code, which appears to be broader than former law, makes it clear that theft requires unlawful conduct with the intent to deprive the owner of property whereby the *actor obtains the property or exercises control over it.*

determine whether the representations were made before or after petitioner's purchase.[13]

Finally, the deduction must also be denied because the petitioner has failed to produce any evidence regarding the amount of the loss. *Henry Schwartz Corp.*, 60 T.C. 728 (1973). The basis of the 750 shares of stock has been stipulated. The parties have also stipulated that the stock did not become worthless in 1966. There is, however, no evidence as to how much value the stock retained. Even if the decline in value were known, it would be impossible on the record of this case to estimate the specific portion of the decline attributable to the illegal activities of the corporate officers petitioner describes as "theft," as opposed to the decline that might be attributable to business risks, market decline, poor or derelict management, and other illegal acts clearly not comprising any of the elements of a theft. Thus, even if the evidence disclosed a theft, the record contains no evidence with respect to the amount of any theft loss. In fact, the record is so deficient that an estimate of the loss is impossible. *J. J. Dix, Inc. v. Commissioner*, 223 F. 2d 436 (C.A. 2, 1955), certiorari denied 350 U.S. 894 (1955).

We emphasize that petitioner claims a theft loss in 1966 under section 165(c)(3) deductible against ordinary income, rather than a capital loss arising from the sale or exchange of securities or from securities becoming worthless during the taxable year under the provisions of section 165(c)(2), (f), and (g).[14] While the value of petitioner's stock declined in value, probably in large measure as a result of the illegal acts of the corporation, petitioner stipulated that his investment did not become worthless in 1966 and he had a continuing investment in the reorganized corporation several years later. Petitioner has in reality attempted to convert a potential capital loss from the sale of stock into an ordinary theft loss and to accelerate the date when the loss may be deducted. Since petitioner has failed to carry his burden of proof this attempt must fail and the deduction must be denied.

*Decision will be entered for the respondent.*

---

[13] All of the above factors clearly distinguish this case from our decision in *Paul C. F. Vietzke*, 37 T.C. 504 (1961), in which the petitioner's money was criminally appropriated by individuals who made fraudulent misrepresentations to him and which he in fact relied on in making the investment he claimed as a theft loss.

[14] In view of this distinction, it is unnecessary for us to consider the applicability of sec. 371. See *Edith M. Greenwood*, 41 B.T.A. 664 (1940).