FENIMORE STORCH AND IDA MAE STORCH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
STORCH v. COMMISSIONER
Docket No. 8129-82.
United States Tax Court
T.C. Memo 1985-17; 1985 Tax Ct. Memo LEXIS 614; 49 T.C.M. (CCH) 497; T.C.M. (RIA) 85017; January 10, 1985. Walter J. Moloughney, for the petitioners. John J. Ferrente, for the respondent. FEATHERSTON MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in petitioners' Federal income tax as follows: Year
Amount
1976
$2,974
1977
11,281
1978
9,743
1979
26,533 Several issues raised by the pleadings have been settled. The only issues remaining for decision are: (1) Whether petitioners are entitled to a theft loss deduction under section 165(c)(3) [1] for 1977 with respect to funds advanced to North Broadway Funding Corporation; and (2) Alternatively, whether petitioners are entitled to a nonbusiness bad debt deduction under section 166(d) with respect to the funds advanced to North *616 Broadway Funding Corporation. FINDINGS OF FACT At the time they filed their petition in this case, petitioners were legal residents of Pompano Beach, Florida. They filed their joint Federal income tax returns for 1976 through 1979 with the Internal Revenue Service Center, Chamblee, Georgia. Ida Mae Storch is a petitioner in this case only because she filed a joint return with her husband, Fenimore Storch, and he will, therefore, be referred to herein as petitioner. Sometime in 1970, petitioner read an advertisement placed in the New York Times by North Broadway Funding Corporation (NBFC) inviting investments in second mortgages and promising a 12-percent return on investments. Petitioner visited the offices of NBFC and met with William Burke (Burke) and Jerome Stern (Stern), NBFC principals, along with their attorney, Paul Burlant. NBFC held itself out as an organization engaged in providing capital financing to small businesses and individuals. Petitioner introduced in evidence an undated brochure which he received at *617 some unstated point in time from NBFC which is entitled "Loans to Business." The brochure states that it is "a copy of the procedure and explanation for making these loans" and represents that "[we] have never had to fore-close a loan because of the margin of safety we require for our security." The brochure describes the "Procedure for Making Loans" as follows: "Loans are made to corporations only. Security for the loans must be real property (real estate). Mortgages on the property are insured by the Title Guaranty Company and North Broadway Funding Corp. is named as the insured. North Broadway Funding Corp. is endorsed on the fire insurance policy. All officers as well as their wives must personally guaranty the loan. We require estoppel certificates and confessions of judgment from each individual as well as their wives. The investor receives a note for the amount of his investment from North Broadway Funding Corp. as well as an assignment of the mortgage and all the securities for the loan. The assignments are held in escrow by the attorneys. Following a section on "Steps in Research for Loan" is a section entitled "Making the Loan:" After all *618 the research is completed and the loan is approved, the borrower and the individuals sign the Truth in Lending forms at the office of our attorneys, Burlant & Lehrer, Esqs. Formal closing of the loan on the 4th day after signing the Truth in Lending papers at the office of Burlant & Lehrer, Esqs. All papers listed in the procedure for making loans are signed with all attorneys present as well as the closer from the title company. The investor is endorsed on all papers for the amount of his investment. All papers and charts of payment as well as the note from North Broadway Funding Corp. are mailed to the investor by Burlant & Lehrer, Esqs. It is after signing of the Truth in Lending papers and during the four day interval that we call the investor and explain the entire loan. No loan is made without the specific approval from the investor for his investment into that loan. If the investor desires to invest in the loan explained to him, he mails his check to Burlant & Lehrer, attorneys North Broadway Account, 366 North Broadway, Jericho, New York, 11753. The money is held in escrow until the loan is consumated [sic]. Interest is paid to the investor from the day the *619 attorneys receive the check. If the loan, for any reason is not concluded, the check is returned to the investor. The record does not contain any agreement between petitioner and NBFC regarding his loans other than a promissory note dated May 31, 1975, which is described below. Beginning in 1970, and continuing to some date prior to May 1975, petitioner loaned substantial amounts of money to NBFC and NBFC executed and delivered to petitioner promissory notes for the loan amounts. NBFC paid petitioner interest at the rate of 12 percent per annum on the loans until April 1977. Neither the amounts of the loans nor the dates they were made are shown by the record. On the joint Federal income tax returns for 1974 through 1977, petitioner reported interest income from NBFC as follows: Year
Amounts
1974
$14,031
1975
23,760
1976
25,189
1977
1,315
On May 31, 1975, NBFC gave petitioner its promissory note in the amount of $261,730.27, payable in equal monthly installments of principal and interest, each in the sum of $4,620.26; the payments were to commence on July 1, 1975, and continue until July 1, 1982, when any unpaid balance of principal and *620 interest would become due and payable. The note, which contains no reference to any security, states, among other things, that it "is a direct obligation of the Corporation and is authorized by the Board of Directors." The note represented a consolidation of the balance of all loans petitioner had made to NBFC prior to May 31, 1975. Sometime in 1977, apparently early in the year, NBFC filed a petition for an arrangement with its creditors in bankruptcy in the United States District Court for the Eastern District of New York. Petitioner was named to the creditors' committee. subsequently, in 1977, NBFC was adjudicated as bankrupt, and liquidation proceedings were still pending at the date of the trial of this case. Petitioner filed a claim in the NBFC bankruptcy proceeding in the amount of $275,000. On March 16, 1981, Edward P. Frey, attorney for the trustee, wrote petitioner a letter stating that "The list of creditors prepared by the Court-appointed accountants, Weber, Lipshie & Co., from the Bankrupt's records indicates that you are a creditor of the estate in the amount of $223,316." The letter invited petitioner to substantiate his claim for a greater amount or *621 to accept the amount shown in the bankrupt's records. The letter shows that on April 10, 1981, petitioner agreed to the $223,316 figure. On March 2, 1984, the Bankruptcy Judge issued an Order for Final Meeting of Creditors and Notice of Filing of Final Accounts of Trustee and of Final Meeting of Creditors, scheduled for March 13, 1984. The notice states that the account of the trustee shows total receipts of $2,300,815.13, total disbursements of $1,383,756.61, with a balance on hand of $917,058.52 and claims of general creditors totaling $4,989,925.86. At the time of the trial of this case, the bankruptcy proceeding had not been closed. Petitioners filed a Form 1040X, Amended U.S. Individual Income Tax Return, for 1977 on April 2, 1979, in which they claimed a short-term capital loss in the amount of $297,000 for a "Non-business bad debt: North Broadway Funding Corp. (Declared Bankrupt)." Subsequently, petitioners filed a second Form 1040X, Amended U.S. Individual Income Tax Return, for 1977, dated December 26, 1979, in which they claimed a theft loss in the amount of $198,850 for the "unrecovered portion of taxpayer's investment in secured debt instruments issued *622 by North Broadway Funding Corporation." To this second Form 1040X is attached the following "Statement to Support Theft Loss Deduction:" Amount of loss: $198,850, which represents taxpayer's unrecovered portion of cash invested in secured debt instruments issued by North Broadway Funding Corporation. See attached schedule of computation of this amount. Date of discovery: Taxpayer's attorney first obtained substantial evidence in 1977 that fraud was involved in North Broadway Funding Corporation's issuance of said debt instruments to taxpayer and various other investors. Nature of fraud: Taxpayer's attorney began investigating said corporation following the corporation's being adjudicated bankrupt in 1977. Among the facts uncovered in the course of this investigation were: (1) No investments (mortgage loans) were made by said corporation after 1974; and (2) All monies received by said corporation in 1975, 1976 and 1977 (i.e., the source of the monies paid to taxpayer during these three years) were invested capital from third-party investors. These facts led to the conclusion that all monies paid to taxpayer in 1975, 1976, and 1977 represented a return of taxpayer's capital *623 which had been invested in secured debt instruments issued by said corporation and that no interest was received. Thus the corporation's operations were actually nothing more than a large-scale Ponzi Scheme. Based on these facts, taxpayer on April 2, 1979 filed amended Federal income tax returns for the years 1975 through 1977, in which interest income was reclassified as return of capital. The I.R.S. Atlanta Center is still processing these earlier amended returns. Prospect of recovery: In all probability, taxpayer will recover none of his investment. In the unlikely event that the remaining assets of the bankrupt North Broadway Funding Corporation are sufficient to provide partial repayment to investors, such payment will certainly be negligible in amount when compared to taxpayer's investment. Petitioners also filed Forms 1040X, Amended U.S. Individual Tax Returns, for 1974, 1975 [2], 1976, as well as 1977, in which they reported that they had net operating losses attributable to the claimed NBFC theft loss, and reported for 1975 and 1976 that the interest income originally reported in the amounts set forth above for those years represented "a return of taxpayer's *624 capital invested in secured debt instruments issued by said corporation, and that no interest was in fact received." Petitioners also filed a Form 1040X, Amended U.S. Individual Income Tax Return, for 1978 and a return for 1979 claiming deductions for portions of the claimed unabsorbed 1977 net operating loss. In the notice of deficiency for 1976, 1977, 1978, and 1979, respondent included the following paragraphs pertinent to the issues here in controversy: (q) It is determined that the reduction of interest income of $1,315.00 as claimed on your 1040X filed April 2, 1979 for the year 1977 and tentatively allowed by the Service Center is interest income under Section 61 of the Internal Revenue Code. Therefore, your taxable income is increased *625 $1,315.00 in 1977. (r) The amount of $297,000 shown on your 1977 return as a non business bad debt resulting from investment in North Broadway Funding Corporation is disallowed because it has not been established that this investment became worthless within the taxable year 1977 or that you exhausted all reasonable prospects of recovery. In the event a loss did occur in 1977, your investment of $239,115.00 would be deemed a non business bad debt subject to the capital loss limitations of Section 1211(b) of the Internal Revenue Code. Therefore, your taxable income is increased, as follows: 1977
1978
Capital Loss Allowable
Claimed per return
$2,000.00
$3,000.00
Increase to taxable income
$2,000.00
$3,000.00
Respondent also determined that "there is no net operating loss in 1977 or 1978 available for carryover to 1979." OPINION 1. Theft Loss Issue
Based on his dealings with NBFC, petitioner maintains that he is entitled to a theft loss deduction for 1977 in the amount of $223,316 [3] under section 165 [4] which is subject to carryback to the 3 preceding taxable years and carryover to 1978 and 1979 under *626 section 172(b). Petitioner contends that Burke and Stern of NBFC represented to him that, if he would advance funds to NBFC, NBFC would invest those funds in second mortgages on real estate bearing interest at the rate of 12 percent per annum and that petitioner would be named the mortgagee. Between 1970 and May 1975, petitioner invested substantial sums under this arrangement and on May 31, 1975, he received a promissory note from NBFC in the amount of $261,730.27. *627 Petitioner's position, as we understand it, is that when he received the promissory note from NBFC dated May 31, 1975, he agreed to relinquish the several second mortgages that he was holding until that date. In lieu of the second mortgages, petitioner was to receive as collateral for the promissory note a deed to a specific piece of property in Lattingtown, Long Island, New York. Petitioner testified that the deed was mailed to him in Florida and that it bore revenue stamps and markings indicating that it had been recorded. He further testified, however, that he lost the deed and, when NBFC went into bankruptcy in 1977, he could find no record of a deed to him of any Lattingtown property. On the basis of this testimony, petitioner contends that he suffered a theft loss under section 165(c)(3) in 1977 which he is entitled to carry back to the 3 preceding years and over to 1978 and 1979 under section 172(b). Respondent makes a series of alternative counterarguments. First, respondent argues that petitioner has not carried his burden of proof of a theft loss, citing Paine v. Commissioner,63 T.C. 736 (1975), affd. without published opinion 523 F.2d 1053 (5th Cir. 1975). *628 Alternatively, respondent argues (1) that there was a reasonable prospect in 1977 that petitioner would recover all or a substantial part of his NBFC advances, citing Ramsay Scarlett and Co., Inc. v. Commissioner,61 T.C. 795, 811 (1974), affd. 521 F.2d 786 (4th Cir. 1975); (2) that petitioner has thus failed to establish the amount of his loss, citing Archer v. Commissioner,227 F.2d 270 (5th Cir. 1955), affg. a Memorandum Opinion of this Court; and (3) that, assuming a loss was incurred, the loss was at most a nonbusiness bad debt under section 166; but (4) that petitioner is not entitled to a nonbusiness bad debt deduction for 1977 because he has failed to show that the debt was wholly worthless in that year. We hold for respondent. As explained in Edwards v. Bromberg,232 F.2d 107, 110 (5th Cir. 1956), the word "theft" as used in section 165-- is not like "larceny", a technical word of art with a narrowly defined meaning but is, on the contrary, a word of general and broad connotation, intended to cover and covering any criminal appropriation of another's property to the use of the taker, particularly *629 including theft by swindling, false pretenses, and any other form of guile. * * * [Fn. ref. omitted.] In a number of cases, theft loss deductions have been sustained by this Court where the theft consisted of false representations made to the taxpayer which induced him to part with his money or property. Nichols v. Commissioner,43 T.C. 842, 884-886 (1965); Norton v. Commissioner,40 T.C. 500, 504-505 (1963), affd. 333 F.2d 1005 (9th Cir. 1964); Monteleone v. Commissioner,34 T.C. 688, 692-693 (1960). Whether or not an activity constitutes a theft depends on the law of the State where the loss was sustained. Edwards v. Bromberg,supra at 111; Paine v. Commissioner,supra at 740. Attempting to sustain the claimed deduction, petitioner points to N.Y. Penal Law sec. 165.00 (McKinney 1975), [5] McKinney's Consolidated Laws of New York, which, in general terms provides that the misapplication of property without the owner's consent so as to create a risk that the owner will suffer pecuniary loss is a misdemeanor. Petitioner argues, at *630 one point, that NBFC represented that he would be a secured creditor; at another point, he contends that he was to have a specific interest in the real estate in which his funds were invested and that he would receive a deed to such property. After NBFC went into bankruptcy, he contends that he learned for the first time that "NBFC was not a company involved in lending second mortgages with its investors receiving valid deeds issued in their names." On this theory petitioner contends that he was swindled by NBFC. *631 We do not think the evidence of record provides any ground for allowance of the claimed theft loss. Although NBFC was engaged in real estate transactions, which are ordinarily carefully documented, we have before us no documentation whatever of any such transactions. Nor do we have any testimony from Burke or Stern, who operated NBFC, or Burdant or Lehrer, the attorneys who represented NBFC. There is no evidence that petitioner subpoenaed any one of these individuals to testify, or that he subpoenaed any of their records or copies of any of the correspondence which petitioner admitted he had received from them when he advanced the funds. At the time of the trial, NBFC had been in bankruptcy for several years, but petitioner made no effort to introduce any of the precise information concerning NBFC's assets or activities that had almost assuredly been developed in the bankruptcy proceedings. The trial record before us simply does not show that NBFC did not do with the money it received from petitioner exactly what it represented to him that it would do. The only documents in evidence reflecting in any way the nature of the relationship between petitioner and NBFC are the promissory *632 note and the undated brochure described in our findings. The promissory note, dated May 31, 1975, is in the amount of $261,730.27 with interest at the rate of 12 percent per annum payable to petitioner in monthly installments of $4,620.26 over a 7-year period. The note contains no language to suggest that it is secured in any way. The only other pertinent document in evidence is the undated, ambiguous brochure entitled "Loans to Business" and bearing the name of NBFC. The brochure states that an investor with NBFC would forward his check to Burdant and Lehrer, attorneys; that "the note from North Broadway Funding Corporation" would be mailed to the investor; and that interest would be paid beginning with the date of the receipt of the check, not when the money was invested in a second mortgage. The brochure states that NBFC would make loans secured by mortgages on real estate approved by the investor. The mortgages were to be insured by a title company with NBFC, not the investor, named as the insured. The investor was to receive an assignment of the mortgage securing the loan made with his money, but the assignment was to be held in escrow by the attorneys. Because *633 petitioner apparently made no effort to obtain either the records of NBFC or the testimony of the NBFC principals or their attorneys, he has not shown that NBFC and its attorneys did not abide by the representations in the brochure. Apart from these two documents, the promissory note and the brochure, we have only the imprecise and sometimes rambling testimony of petitioner concerning his relationship with NBFC in which he tried to spell out some kind of wrongdoing by NBFC. From the credible evidence of record, however, we think it reasonably clear that petitioner loaned money to NBFC with the understanding that NBFC would use that money to make loans secured by second mortgages on real estate. The second mortgages went sour; NBFC was forced into bankruptcy; and petitioners may lose all or most of their investment. The assignments or partial assignments of the mortgages taken by NBFC which, according to the brochure, were to be held in escrow by the NBFC attorneys, apparently were never intended to alter petitioner's debtor-creditor relationship with NBFC. The brochure states that accrual of interest was to begin on the date of receipt by NBFC's attorneys of an investor's *634 check, not when a loan was made. In addition, petitioner admitted that his payments from NBFC were keyed to 12 percent of his loans to NBFC, not to collections on the second mortgages. If petitioner had actually been the mortgagee, his losses would have occurred as the loans to the mortgagors became uncollectible, not upon the final liquidation of NBFC. Consistent with our conclusion that petitioner loaned money to NBFC, petitioner's income tax returns for 1974, 1975, 1976, and 1977 show the receipt of interest income from NBFC, not from various second mortgage borrowers to whom he now says he thought he was lending money. Moreover, petitioner's first amended tax return for 1977 claimed a deduction for a "Nonbusiness bad debt: North Broadway Funding Corp. (Declared Bankrupt)" and not losses from debts from the several mortgagors. In the promissory note dated May 31, 1975, NBFC agreed to pay $261,730.27; the note recites that "This is a direct obligation of the Corporation and is authorized by the Board of Directors." There is no evidence that petitioner ever released any mortgages when they were paid off even though he admitted that he received regular monthly payments *635 from NBFC from 1970 to April 1977. We think petitioner simply loaned money to NBFC which, he knew, was then dealing in risky second mortgages. Now petitioner finds that he will suffer a loss as a result of NBFC's financial failure. This does not constitute a section 165(c)(3) theft loss. No violation of the New York statute quoted in footnote 5, supra, has been shown. Petitioner devoted a great deal of his testimony to an alleged deed covering property at an unknown location in a Lattingtown project which he claimed to have received as collateral for his advances to NBFC. At one point in his testimony, petitioner could not remember the year he received the deed.At another point, he testified that the deed was given to him as collateral for NBFC's $261,730.27 promissory note dated May 31, 1975. He testified that, although NBFC signed the note, Skipper Land Company, a subsidiary of NBFC, signed the deed and that it covered property in Lattingtown, Long Island, New York. Petitioner testified that the deed bore revenue stamps and indicated that it had been properly recorded. Petitioner testified that he lost the deed when he moved from one location to another. As a member of *636 the creditors' committee in the bankruptcy proceeding, he reviewed NBFC's files, but could find no evidence of the deed. On the basis of this testimony, he contends that he was the victim of a swindle. We find petitioner's testimony on the lost deed to be too vague, self-contradictory, and imprecise to be credible. As we have stated, none of the records of NBFC or its attorneys on dealings with petitioner have been placed in evidence. None of the NBFC officials or attorneys were called to corroborate petitioner's testimony. The May 31, 1975, promissory note, as we have stated, does not indicate that it is secured in any way. Petitioner met with Burke and Stern of NBFC four or five times a year, according to his testimony, and visited the Lattingtown project with them "within a month or so" before he allegedly received the deed. He saw the model homes and vacant lots in the project even after he received the deed. According to his testimony, he was nonetheless unsure whether the deed covered one or more model homes that had been built or only vacant lots on which Burke and Stern promised to build houses. He testified that, after the bankruptcy proceeding was initiated, *637 he went "from courthouse to courthouse all over Long Island" trying to find where his deed was recorded. It is difficult to understand why he would do this if, as he testified, all of his alleged dealings with Burke and Stern related to the Lattingtown project. When pressed for details as to how this recorded-deed-as-collateral arrangement was to work, petitioner in effect pleaded ignorance. His counsel explained that "Mr. Storch is not a real estate individual." We have no explanation as to what arrangements he thought he had worked out for the release of his collateral when the property allegedly covered by the deed was sold. We are not convinced that petitioner ever received such a deed. Our doubts as to the existence of a deed are further confirmed by the fact that the statements attached to the amended tax returns, quoted in our findings, contain no mention of a deed. Petitioner sued Skipper Land Company, but the trial record in the instant case does not show that a lost deed figured in any way in that litigation. The earliest mention of an alleged deed as collateral for the loans that we have found is in the petition filed in the instant proceeding which states *638 that "The taxpayer recalls that he did receive what he believed to be a deed from North Broadway Funding Corp." We are not convinced that petitioner was swindled or that he otherwise suffered a section 165(c)(3) theft loss. 2. Nonbusiness Bad Debt Issue
Section 166(a) provides for the allowance of a deduction for any debt which becomes wholly worthless within the taxable year. Under section 166(d), however, in the case of a taxpayer other than a corporation, section 166(a) does not apply to any "nonbusiness debt." A nonbusiness debt is a debt other than a debt created or acquired in connection with a trade or business of the taxpayer or a debt the loss from which is incurred in the taxpayer's trade or business. [6]
*639 As we have indicated above, we think it clear that petitioner loaned money to NBFC and thereby created a debtor-creditor relationship between himself and the borrower. To show that he suffered a deductible loss in 1977, however, petitioner had the burden of proving that the debt became wholly worthless in that year; partial worthlessness will not suffice.Sec. 1.166-5(a)(2), Income Tax Regs. A debt becomes wholly worthless in the year in which identifiable events clearly mark the futility of any hope of recovery. James A. Messer Co. v. Commissioner,57 T.C. 848, 861 (1972). Worthlessness is a question of fact and all pertinent evidence is to be considered. Sec. 1.166-2(a), Income Tax Regs.; Perry v. Commissioner,22 T.C. 968, 973 (1954). Adjudication of bankruptcy alone does not justify a bad debt deduction where there is a reasonable probability that some assets will be available to unsecured creditors. Dallmeyer v. Commissioner,14 T.C. 1282, 1292 (1950). The evidence shows that NBFC was declared bankrupt in 1977, but it does not show that petitioner's debt claim became wholly worthless in that year. *640 Petitioner testified and his brief admits that, as a member of the creditors' committee, he "found that NBFC had assets of approximately $5,000,000 and liabilities of approximately $8,000,000." Petitioner's claim was allowed by the Bankruptcy Judge in the amount of $223,316 on May 1, 1981. The order for the final meeting of creditors was not set until March 13, 1984, and at that time the trustee's balance on hand was $917,058.82. Even at the date of the trial of this case, therefore, petitioner did not know and could not prove what his ultimate recovery would be. His debt claim was not shown to be wholly worthless in 1977. To reflect concessions on other issues, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect, during the tax years in issue, unless otherwise noted.↩
2. The tax years 1974 and 1975 are pertinent here only because of petitioners' claim to a net operating loss carryback deduction to those years; the tax year 1975 is pertinent also as an income averaging base year because of petitioners' claim to the right to use the income averaging method of computing their liabilities for the open years. Neither 1974 nor 1975 is open for the assessment of deficiencies.↩
3. Petitioner has used a veriety of figures in attempting to quantify his loss. The above figure of $223,316 is the amount allowed as petitioner's claim in the NBFC bankruptcy proceeding. ↩
4. SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals.-- In the case of an individual, the deduction under subsection (a) shall be limited to-- * * * (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. * * * * * * (e) Theft Losses.--For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss. * * *↩
5. N.Y. Penal Law sec. 165.00 (McKinney 1975), provides as follows: Sec. 165.00 MISAPPLICATION OF PROPERTY 1. A person is guilty of misapplication of property when, knowingly possessing personal property of another pursuant to an agreement that the same will be returned to the owner at a future time, he loans, leases, pledges, pawns or otherwise encumbers such property without the consent of the owner thereof in such manner as to create a risk that the owner will not be able to recover it or will suffer pecuniary loss. 2. In any prosecution under this section, it is a defense that, at the time the prosecution was commenced, (a) the defendant had recovered possession of the property, unencumbered as a result of the unlawful disposition, and (b) the owner had suffered no material economic loss as a result of the unlawful disposition. Misapplication of property is a class A misdemeanor.↩
6. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debts.-- There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts.-- When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * * (d) Nonbusiness Debts.-- (1) General Rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.-- For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which, is incurred in the taxpayer's trade or business. * * *↩