RONALD C. BRECHTEL AND EVE A. BRECHTEL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brechtel v. Commissioner
Docket Nos. 7878-80, 16898-80.
United States Tax Court
T.C. Memo 1985-495; 1985 Tax Ct. Memo LEXIS 134; 50 T.C.M. (CCH) 1118; T.C.M. (RIA) 85495; September 23, 1985. *134 Held: Petitioners failed to carry their burden of proving that jewelry was stolen from their bank safe-deposit box. Petitioners' theft loss deductions are disallowed. Sec. 165(c)(3), I.R.C. 1954. Walker H. Drake, Jr., for the petitioners. H. Karl Zeswitz, for the respondent. CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax and an addition to tax under section 6653(a) [1] (negligence, etc.) against petitioners, as follows: Addition to Tax
Docket No.
Year
Deficiency
sec. 6653(a)
7878-80
1977
$10,181
$509
16898-80
1978
$ 4,460
These cases have been consolidated for trial, briefs, and opinion. After concessions by petitioners, the issues for decision are as follows: (1) Whether petitioners are entitled to a section 165(c)(3) theft loss deduction because of the asserted disappearance of jewelry from their safe-deposit box and, if so, in what amount; (2) Whether petitioners are liable for the negligence addition to tax under section 6653(a). FINDINGS OF FACT Some of the facts have *135 been stipulated; the stipulation and the stipulated exhibits are incorporated herein by this reference. When the petitions were filed in the instant cases, petitioners Ronald C. Brechtel (hereinafter sometimes referred to as "Ronald") and Eve A. Brechtel (hereinafter sometimes referred to as "Eve"), husband and wife, resided in Gretna, Louisiana. In 1977, petitioners maintained safe-deposit box number 342, at a branch of the Guaranty Bank & Trust Company (hereinafter sometimes referred to as "the Bank") in Gretna. In this box, they kept various items of importance or value, including items in a "jewelry roll". The jewelry roll is made of cloth; it has pockets with snaps to hold items of jewelry and a bar with snaps to hold rings. Ordinarily, the jewelry roll contained 30 to 45 pieces of jewelry, including the following three rings: (1) one 18-carat emerald cut diamond ring, (2) one lady's diamond ring, 14-carat gold mounting, (3) one lady's diamond ring, platinum mounting, set with 32 tapered baguettes and one pear-shaped centered diamond (these three rings are hereinafter sometimes referred to as "the Jewelry"). Eve occasionally wore some of the jewelry that was usually in the safe-deposit *136 box, including the second and third rings of the Jewelry. When Eve wore items of jewelry from the safe-deposit box, it was her practice to eventually replace the items in the box, but usually not the next day. Eve did not wear the 18-carat emerald cut diamond ring of the Jewelry. In order to enter their safe-deposit box, either petitioner is required by an attendant at the Bank to sign an access card. The signature thus made is then compared with the signatures at the top of the card made by each petitioner when petitioners entered into the lease agreement with the Bank for the safe-deposit box. Petitioners and the attendant then enter the Bank's vault. To open the door of the drawer in which the safe-deposit box is stored requires the simultaneous use of (a) one of two customer keys and (b) a master key retained by the bank. [2] *137 Petitioners' customer key is left in the drawer door while petitioners inspect the safe-deposit box in a cubicle set aside by the Bank for this purpose. Neither of petitioners' customer keys has ever been lost, stolen, or out of petitioners' possession. There is no evidence of a forced entry into safe-deposit box number 342. Eve entered safe-deposit box number 342 on May 17, 1976, at 10:55 a.m. Eve next entered the box on May 19, 1976, at 9:25 a.m. The Jewelry was in the box at that time. Ronald entered the box on May 19, 1976, at 11:00 a.m. Nothing appeared to be missing from the box at that time. On June 8, 1976, at 10:30 a.m., Eve again entered box number 342. On or shortly after June 8, 1976, petitioners notified the Bank that the Jewelry was missing from their safe-deposit box. On July 15, 1976, petitioners executed a lease agreement with the Bank for safe-deposit box number 423 at the same branch of the Bank. The lease agreement for safe-deposit box number 342 was terminated on July 16, 1976. Petitioners attached to their 1977 tax return an appraisal for the 18-carat emerald cut diamond ring of the Jewelry. This apraisal is addressed to Ronald and is dated August 21, 1976. On October 1, 1976, the Bank submitted a claim *138 to Insurance Company of North America on account of the Jewelry. On November 8, 1976, Insurance Company of North America advised the Bank that the insurance policy covering this type of loss had been cancelled effective May 9, 1976. [3]
The Jewelry was not insured. Petitioners did not file any police report claiming a theft of the Jewelry from safe-deposit box number 342. Petitioners did not advertise in any local newspaper or other published materials, seeking recovery of the Jewelry. On advice of an attorney, petitioners did not file a written claim against the Bank regarding the claimed theft loss. [4] *139 Petitioners maintained their lease agreement for safe-deposit box number 423 at the same branch of the Bank for several years after the claimed June 8, 1976, theft from safe-deposit box number 342. The security measures at this branch of the Bank were unchanged since 1973. On petitioners' 1977 Federal individual income tax return, they claim a $55,900 casualty loss deduction on account of the claimed theft of the Jewelry. [5] Petitioners' 1977 tax return shows adjusted gross income of $55,332, *140 but no tax table income. On their 1978 tax return, petitioners claim $24,867 as a "Nonbusiness Theft Loss Carryover from 1977." The carried-over 1977 loss was generated by the claimed theft loss deduction. [6] Respondent disallowed the entire theft loss deduction on both the 1977 and the 1978 tax returns. OPINION Petitioners maintain that they sustained a casualty loss from a theft of certain items of jewelry from a bank depository box. Petitioners claim they are entitled to a casualty loss deduction for 1977 (see n.4, supra), pursuant to section 165(c)(3), of $49,000, their cost basis in the jewelry. [7] *141 Respondent asserts that petitioners have failed to prove that a theft occurred, and thus, no theft loss deduction is available. Respondent further asserts that, even if we hold that a theft did occur, petitioners have failed to establish a basis in the property by adequate and reliable evidence. We agree with respondent that petitioners have failed to carry their burden of proving that a theft occurred; accordingly, we need not address the issue of petitioners' basis in the property. Section 165[8] *142 permits individuals to deduct nonbusiness theft losses to the extent not compensated for by insurance or otherwise. The issue of whether a theft loss has been sustained depends on the law of the applicable jurisdiction. Paine v. Commissioner,63 T.C. 736, 740 (1975), affd. without published opinion, 523 F.2d 1053 (CA5 1975); Monteleone v. Commissioner,34 T.C. 688, 692 (1960), and cases there cited. Louisiana law defines "theft" as follows: Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation *143 or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential. La. Rev. Stat. Ann. § 14:67 (West 1974); State v. Doughty,379 So.2d. 1088, 1091 (La. 1980). We come then to the factual question of whether a theft occurred. The standard for weighing the evidence was stated by this Court in Allen v. Commissioner,16 T.C. 163, 166 (1951), as follows: Petitioner has the burden of proof. This includes presentation of proof which, absent positive proof, reasonably leads us to conclude that the article was stolen. If the reasonable inferences from the evidence point to theft, the proponent is entitled to prevail. If the contrary be true and reasonable inferences point to another conclusion, the proponent must fail. If the evidence is in equipoise preponderating neither to the one nor the other conclusion, petitioner has not carried her burden. See Elliott v. Commissioner,40 T.C. 304, 311 (1963); Jones v. Commissioner,24 T.C. 525, 527 (1955). A disappearance of an item under unexplained circumstances does not in and of itself prove a theft loss. Bakewell v. Commissioner,23 T.C. 803, 805 (1955); *144 Allen v. Commissioner,supra.A sufficient showing must be made for the Court to infer that an actual theft was made by some individual, although it is not necessary to show who what individual was. Jones v. Commissioner,24 T.C. at 528. We proceed to examine the record in the instant case so that we may determine if petitioner have carried their burden of proving [9] that they sustained a loss which arose from theft. Welch v. Helvering,290 U.S. 111 (1933); Allen v. Commissioner,supra;Rule 142(a), Tax Court Rules of Practice & Procedure. Petitioners assert that the claimed theft occurred by way of an unauthorized taking of the Jewelry from petitioners' safe-deposit box at the Bank. We have detailed in our findings the procedures used by the Bank to provide security for the safe-deposit boxes. The Bank's president, petitioners' own witness, testified that he was not aware of any successful claim against the Bank for loss from a safe-deposit box. This testimony suggests the unlikelihood of any theft that the Bank might *145 have contributed to by negligence or otherwise. About five weeks after the June 8, 1976, date on which petitioners claim they discovered the theft, [10] petitioners terminated their lease on the safe-deposit box from which the Jewelry assertedly was stolen. This points to a conclusion that petitioners, at least, believed that there was a security problem. There is no evidence of a forced entry into the safe-deposit box, so apparently this was not the way the asserted thief gained access to the Jewelry. Petitioners testified that their customer keys have never been lost, stolen, or out of their possession, so apparently this was not the way the asserted thief gained access to the Jewelry, either. Perhaps the problem lay in the security measures used by the Bank. The office manager of that branch of the Bank testified, without contradiction, that the security measures used by the Bank were not changed since 1973. Notwithstanding this continuation of the same security measures that might have facilitated the asserted theft of $56,000 worth of jewelry, petitioners promptly entered into a lease for another safe-deposit box at the same branch of the Bank, and maintained that new lease *146 for several years afterward. This suggests to us that petitioners did not really believe that the Bank's security measures were at fault. The foregoing makes it difficult to conclude that it is more likely than not that petitioners sustained a loss arising from a theft of the Jewelry from the safe-deposit box. Although the jewelry roll contained 30 to 45 pieces of jewellry, only three pieces are asserted to have been stolen. No explanation has been suggested as to why a thief might have stolen the three pieces of jewelry in question, but not the other pieces of jewelry. This, too, makes it difficult to accept the hypothesis that there was a loss arising from a theft *147 of the Jewelry from the safe-deposit box. Petitioners claim that the Jewelry had an aggregate fair market value of $56,000. This loss exceeded petitioners' entire adjusted gross income for 1977. Yet, petitioners neither filed a police report, nor placed an advertisement in any published material, nor filed a written claim against the Bank. Ordinarily, we would not expect victims of so large a theft to accept the theft so passively. At trial, Eve testified that she entered the box four times on June 8, 1976, and that she discovered the Jewelry was missing on that day; Ronald testified that he entered the box once that same day. Yet, the stipulated access record for the box shows that Eve entered the box only once on June 8, 1976, and that no one else entered the box at all after May 19, 1976, and before July 14, 1976. At trial, one of the witnesses speculated that perhaps another employee did not follow the usual access procedure when petitioners returned on June 8, 1976. The conflict between petitioners' story and the implications of the stipulated access record should have been apparent. Petitioners testified, as did various officials and employees of the Bank, including the *148 employee who assertedly admitted petitioners to the safe-deposit box. We would have expected petitioners to present evidence to prove that the access record was incomplete in this instance, instead of leaving it to speculation by one person as to what another person might have failed to do. This is merely another loose end that makes it difficult to accept petitioners' description and explanation of the events. Taking into account all the foregoing, we conclude that petitioners have failed to carry their burden of proving that they sustained a loss which arose from theft. We hold for respondent. Finally, respondent determined an addition to tax for 1977 pursuant to section 6653(a) (negligence). The burden of proof with respect to this addition to tax is on petitioners. Welch v. Helvering,supra;Rule 142(a), supra.Petitioners have not presented any evidence either at trial or on brief to carry their burden of showing that the addition to tax is not applicable. Accordingly, we must sustain the Commissioner in his addition to tax under section 6653(a). Decisions will be entered for the respondent.
Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue.↩
2. If a customer key is lost or destroyed, then a replacement key is not issued. The lock on the safe-deposit box is drilled and replaced and two new keys are issued. However, if a safe-deposit box is surrendered, then the locks are not changed; in effect, the Bank hands the customer keys down from customer to customer.
3. Insurance Company of North America cancelled the Bank's policy because of losses suffered with respect to bonds issued to cover the banking industry at large and not because of losses related specifically to either safe-deposit boxes or to the Bank. There never was a successful claim against the Bank for a loss from a safe-deposit box.↩
4. Even though petitioners notified the Bank in 1976, the parties agree that, if petitioners carry their burden of proving that there was a loss deductible under section 165(c)(3), then the loss is to be treated as having occurred in 1977. Section 165(e), provides as follows: SEC. 165. LOSSES. * * * (e) Theft Losses.--For purposes of subsection (a), any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss. It may be that it was in 1977 that petitioners concluded that they would neither recover the Jewelry nor receive compensation on account of their claimed loss. Sections 1.165-1(d)(3) and 1.165-8(a)(2), Income Tax Regs.
No evidence was presented on this matter (presumably, because of the parties' agreement). Under these circumstances, and in view of our holding on the primary issue, we do not make any findings or state any conclusions as to the proper year for any loss deduction.↩
5. A loss of $56,000, less the $100 "floor" of section 165(c)(3) (n.8, infra↩). 6. The parties have stipulated that this carryforward is improper and, if we find that a theft loss occurred, then any net loss resulting therefrom for 1977 must first be carried back to the three preceding tax years.↩
7. Petitioners concede that if a theft loss deduction is allowed, it should be limited to the cost of the Jewelry, rather than the fair market value that was originally deducted.
8. Section 165 provides, in pertinent part, as follows: SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b) Amount of Deduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- * * * (3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100. For purposes of the $100 limitation of the preceding sentence, a husband and wife making a joint return under section 6013 for the taxable year in which the loss is allowed as a deduction shall be treated as one individual. * * * [The subsequent amendments of this provision (by sec. 203(b) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 422; and by sec. 711(c)(2)(A)(i) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 943) do not affect the instant case.]↩
9. It is evident that petitioners have carried their burden of coming forward with evidence; the real question is whether they have carried their burden of persuasion.↩
10. In their petitions, petitioners state that Eve discovered the loss of the Jewelry when she entered the safe-deposit box about 9:25 a.m. on May 19, 1976, that she immediately notified Ronald, and that Ronald entered the box about 11:00 a.m. that day and saw that the Jewelry was missing. Yet, at trial, both petitioners testified that nothing appeared to be missing when they entered the box on May 19, 1976. Thus, petitioners' testimony directly contradicts the factual assertions they made in their petitions to this Court.↩