JOHN PETER AND JO ANN MARGARET HARTWICK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hartwick v. Commissioner
Docket No. 18957-84.
United States Tax Court
T.C. Memo 1988-424; 1988 Tax Ct. Memo LEXIS 453; 56 T.C.M. (CCH) 86; T.C.M. (RIA) 88424; September 7, 1988. John Peter Hartwick, pro se. Ronald J. Long, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined a deficiency of $ 23,404.02 in petitioners' Federal income tax for 1980. The issues for decision are: 1. Whether petitioner John Peter Hartwick's partnership Timesharing Partnership incurred certain deductible expenses in 1980; 2. Whether the 1980 expenses deducted by the partnership were attributable to an activity engaged in for profit; 3. Whether the partnership to clearly reflect its income under section 446, [1] where it sold no timeshare units in 1980, is required to allocate its selling expenses to timeshare units later sold; 4. Whether petitioners are subject to an increased rate of interest under section 6621(c), because their underpayment *457 for 1980 was substantial and attributable to tax motivated transactions; and 5. Whether petitioners are entitled to a theft loss deduction for 1980 under section 165 for the cash petitioner John P. Hartwick contributed to acquire a limited partnership interest in the partnership. FINDINGS OF FACT At the time they filed their petition herein, petitioners John Peter and Jo Ann Margaret Hartwick resided in Milwaukee, Wisconsin. Petitioners filed a joint individual income tax return for 1980 with the Internal Revenue Service Center, Kansas City, Missouri. Petitioner John Peter Hartwick (Dr. Hartwick) is a practicing physician and surgeon. Dr. Hartwick practices medicine as an employee of his wholly-owned professional corporation. Timesharing Partnership
On November 25, 1980, Dr. Hartwick purchased a limited partnership interest in Timesharing Partnership for $ 20,000 cash. Timesharing Partnership was a limited partnership formed under the laws of the *458 state of Wisconsin on October 21, 1980. The limited partnership was formed for the stated purpose of purchasing 200 timesharing unit-week intervals (timeshare units) on apartment units at the Hotel on the Cay, Christiansted, St. Croix, U.S.Virgin Islands, and reselling such units prior to December 31, 1980. Timesharing Partnership was one of four limited partnerships formed in 1980 and 1981 by Oliver Plunkett and Martin Gregorcich for the stated purposes of purchasing and reselling timeshare units at the Hotel on the Cay. The four limited partnerships were to acquire a total of 1,000 timeshare units. Each limited partnership would acquire its timeshare units from Mr. Plunkett. Mr. Gregorcich was an attorney and handled much of the legal work in connection with the syndication of the four limited partnerships. The Hotel on the Cay was a resort hotel located on the Protestant Cay, a five and one-half acre island off the main dock in Christiansted, St. Croix. The hotel property consists of two connected buildings. The three-story main building has 48 apartment units, a reception area and a manager's office. The second building has restaurant and lounge facilities on its first *459 floor and eight apartment units on its second floor. Mr. Plunkett had acquired a lease for a 34-year period to the Hotel on the Cay. On August 5, 1980, he converted his interest in the property to a timesharing ownership regime. Timesharing Partnership had two general partners and was to have 15 limited partners. In 1980, the two general partners were John T. Gilligan and a corporation named Milwaukee New Town, Inc. In March 1981, James F. Biese replaced Mr. Gilligan as a general partner in the partnership. Each limited partner was to acquire his interest in the partnership for $ 20,000. The $ 300,000 contributed by the 15 limited partners was to constitute the total capital of the partnership. The partnership's profits and losses were to be allocated 97 percent to the limited partners and three percent to the general partners. The 1980 Partnership Offering Materials
The offering materials given to potential investors in Timesharing Partnership stated that the partnership would purchase 200 timeshare units from Mr. Plunkett for $ 250,000. Mr. Plunkett would be paid the $ 250,000 as follows: $ 25,000 at closing and $ 45,000 on each September 1 during the years 1981, *460 1982, 1983, 1984 and 1985. The offering materials further related that the partnership prior to December 31, 1980, would then resell the 200 timeshare units for $ 1.36 million. The units were thus to be resold for a price of at least $ 6,800 per unit. The partnership would receive a ten percent downpayment on the units resold and be paid the balance of the unit's resale price over five years with interest at eight percent per annum. The partnership for tax purposes would report its gain on the resale of the units on the installment sale method under section 453. In connection with its resale of the units, the partnership would enter into various marketing, promotion, management and sales representation agreements with persons or entities affiliated with Mr. Plunkett. Prospective investors were promised potential 1980 partnership deductions equal to at least three times their cash investment. As discussed in the offering materials, most of the tax deductions generated would be from the marketing, promotion, and sales commission expenses incurred in reselling the units. The partnership would generally report its income and deductions under an accrual method of accounting. *461 Deductions in excess of cash investment were to be generated chiefly through a large, nonrecourse commission payable to the sales representative responsible for reselling the units before the end of 1980. [2]
*462 The offering memorandum stated the cash proceeds raised from the offering would be used to pay the following estimated expenses: Cash down payment to purchase unit-weeks
$ 25,000
Organization expenses
2,500
Syndication expenses
30,000
Nonrecurring marketing management fee
30,000
Advance sales commissions
122,000
Marketing materials, rights to sales
75,000
organization and miscellaneous marketing aids
Closing costs, miscellaneous and
15,000
contingencies
Stated Total
* $ 300,000
The Partnership's Various Unit Resale Agreements
As had been outlined in the offering memorandum, various written agreements for the resale and marketing of the partnership's timeshare units were subsequently executed by the partnership. The chief agreement was with Timesharing Vacation Ownership, Inc., the corporation that was to be the partnership's exclusive sales representative. While these documents bore dates indicating the agreements had been made and entered into in 1980, certain of the documents, *463 in fact, were executed in March of 1981. In actuality, no agreement, oral or written, was made or entered into in 1980 by the partnership and Timesharing Vacation Ownership, Inc. Additionally, many of these agreement documents were signed by James F. Biese as general partner on behalf of the partnership. Mr. Biese became a general partner of the partnership only as of March of 1981. a. Sales Representation Agreement. Under the sales representation agreement, Timesharing Vacation Ownership, Inc. (the sales representative) undertook to sell the 200 timeshare units owned by the partnership prior to December 31, 1980. The units were to be sold for a price of not less than $ 6,800 per unit, and on terms of payment identical to those described in the offering memorandum. The sales representative was to act as the partnership's exclusive sales agent for the units. It was further to refrain from offering or selling other timeshare units at the Hotel on the Cay until the partnership's 200 units were sold. As compensation for its services, the sales representative under the agreement was to receive: 1) a sales commission equal to 51.5 percent of the gross sales price on the initial *464 sale of each timeshare unit and; 2) a commission on the finance charge to be collected by the partnership from purchasers of the units, equal to 30 percent of the total interest charges set forth in the purchase and finance contracts on the initial sale of each unit. These commissions would continue to be payable regardless of whether the purchaser of a timeshare unit defaulted on his installment payment obligation. The sales representation agreement provided that "The above commissions shall accrue in a fixed and determinable amount and be fully due and payable at the time of each [timeshare unit's] sale * * *." The agreement further expressly provided that the partnership would have no personal liability for payment of the commissions. The sales representative was to look solely to the payment proceeds received from unit purchasers to satisfy the partnership's commission obligations. Payment in cash of the commissions were to be made as follows: at least 20 percent of the total commission amount due was to be paid upon each unit's sale and the balance as funds were collected and available, provided the balance was fully paid on or before December 31, 1984. If requested, *465 the partnership would execute nonrecourse promissory notes on the commissions due. The agreement stated: "It is the essence of this agreement that the [partnership] be entitled to deduct the commissions in full for tax purposes at the time of sale, and [the sales representative] shall do nothing to defeat such entitlement." The 200 units of the partnership to be resold were listed in a schedule attached to the sales representation agreement. These units listed differed from those listed in the partnership's November 27, 1980 purchase agreement with Mr. Plunkett. The units listed in the purchase agreement were generally for the more desirable weeks during the months of January, February and December. b. Related Purchase Guarantee Agreement. In addition to the sales representation agreement, the partnership and Kenneth Fenske, the sales representative's president, executed a purchase guarantee agreement document. This document recited that without the guarantee of Mr. Fenske set forth therein, the partnership would not enter into the sales representation agreement. In the document, Mr. Fenske unconditionally guaranteed that all of the partnership's 200 units referred *466 to in the sales representation agreement, would be sold by December 31, 1980, on the terms described in such agreement. He agreed to personally purchase on December 30, 1980, any unsold units on terms identical to those given in the sales representation agreement. If Mr. Fenske purchased units to fulfill this guarantee obligation, the sales representative would still be entitled to receive the commissions specified in the sales representation agreement. c. Administrative Services Agreement. Timesharing Partnership and Mr. Plunkett's corporation, Professional Investment Managers, Inc. (Professional Managers), executed a document dated November 1, 1980, containing an agreement for administrative services. Under this agreement, Professional Managers during 1980 was to advise the partnership on investments of its capaital prior to its investment of the funds in real estate and on the capital needs and requirements of any real estate projects designated by the partnership. Professional Managers was also during 1980 to help establish a bookkeeping system for the partnership on the collection of installment payments from timeshare unit purchasers. It was further to supervise the *467 partnership's accumulation of records and summaries during 1980 so as to facilitate the partnership's preparation of its 1980 tax return, financial statements and reports to partners. For its services, Professional Managers was to be paid a $ 22,700 fee. While the agreement stated the fee was to be deemed earned, due and payable as of December 31, 1980, the fee was to be paid by the partnership in specified installments over a five-year period beginning December 31, 1981. The agreement expressly stated that neither the partnership or any of its partners would be personally liable for the payments. Professional Managers was to look solely to the proceeds collected from timeshare unit purchasers to satisfy its fee. The administrative services agreement document was signed by Martin Gregorcich on behalf of Professional Managers and by James F. Biese, as general partner on behalf of the partnership. d. Marketing Management Agreement, Tangible Marketing Materials Agreement and Intangible Marketing Rights Agreement.
In addition to the administrative services agreement, three other agreements were executed for the partnership with Mr. Plunkett or a corporation of Mr. Plunkett's. *468 The three agreements were: 1) a marketing management agreement dated November 1, 1980; 2) an agreement for tangible marketing materials dated November 10, 1980; and 3) an agreement for intangible marketing rights dated November 10, 1980. Under the marketing management agreement executed by the partnership and Mr. Plunkett's corporation Eastown Properties, Inc. (Eastown Properties), Eastown Properties during 1980 was to render marketing consulting and other services. Eastown Properties in the agreement, was stated to be a licensed real estate broker which had been successfully involved in marketing timeshare units at the Hotel on the Cay. Eastown Properties' duties would include overseeing the partnership's sales representative; advising on special sales and marketing techniques for the timeshare units; disclosing leads on prospective purchasers and having personnel, particularly Mr. Plunkett, available to meet with prospective purchasers. These services were to be performed to the reasonable satisfaction of the partnership before December 31, 1980. As compensation for its services, Eastown Properties was to be paid $ 30,000 in cash on or before December 31, 1980. The agreement *469 was signed for the partnership by James F. Biese, as general partner. The agreement for tangible marketing materials was entered into by Mr. Plunkett and the partnership's sales representative. This agreement stated the sales representative had entered into an agreement to sell 200 timesharing units for the partnership. Under its agreement with Mr. Plunkett, the sales representative acquired the right to use certain marketing materials developed by Mr. Plunkett in connection with its sale of timeshare units for a two-year period, commencing November 10, 1980. For these tangible marketing materials, Mr. Plunkett was to be paid $ 75,000 in cash on or before December 31, 1980. The sales representative in a separate document assigned its interest in the agreement to the partnership. The agreement for intangible marketing rights was also entered into by the partnership's sales representative and Mr. Plunkett. This agreement noted the sales representative had entered into an agreement to sell 200 timeshare units for the partnership. This agreement with Mr. Plunkett would be in effect for a two-year period commencing November 10, 1980. The sales representative was given the right *470 to select and sell and additional 300 timeshare units at the Hotel on the Cay after selling the partnership's 200 units, on purchase terms and commission arrangements similar to those with the partnership. The sales representative was also to have the right to use any sales organizations, personnel, contractual rights and sales leads developed by Mr. Plunkett, in the sale of the 500 timeshare units. Mr. Plunkett was to be paid a total of $ 175,000; $ 70,000 at the time the sales representative began selling the partnership's 200 units and the remaining $ 105,000 at the time the sales representative began selling the 300 units. By separate document, in return for $ 70,000 the sales representative assigned a 40-percent interest in the agreement to the partnership. Units Sold and Partnership Expenses Incurred in 1980
None of the timeshare units listed in the sales representation agreement described above were sold for the partnership in 1980. Kenneth Fenske also never purchased any units from the partnership pursuant to the purchase guarantee described above. Mr. Fenske in 1980 did sell two timeshare units at the Hotel on the Cay to third parties. While these two units *471 had been listed in the partnership's purchase agreement for 200 units with Mr. Plunkett, the units were not listed in the schedule of the partnership's 200 units to be sold attached to the sales representation agreement executed in March 1981. A settlement statement dated December 31, 1980, concerning amounts due the sales representative on the partnership's 200 timeshare units, was prepared. The statement recited the following: AMOUNTS DUE TIMESHARING VACATION OWNERSHIP, INC.: Per Statement dated December 31, 1980 for
legal costs, accounting charges, closing
costs and miscellaneous costs
$ 59,655
Per Statement dated December 31, 1980 for
sales commissions on gross sales prices
and on interest charges
788,200
TOTAL AMOUNT DUE
$ 847,855
SETTLEMENT: Cash payments to Timesharing Vacation
Ownership, Inc. on legal, accounting
closing costs and miscellaneous
$ 38,000
Demand promissory notes received from
unit-week buyers as down payments
86,000
Cash payments
73,500
197,500
BALANCE BY NONRECOURSE PROMISSORY NOTES
* 650,355
*472 The statement was signed and acknowledged as correct by Kenneth E. Fenske for the sales representative and by James F. Biese, as general partner on behalf of the partnership. The settlement statement had been prepared by Martin Gregorcich, the attorney who performed the legal work in connection with the syndication of Timesharing Partnership and the three other limited partnerships formed to sell timeshare units. None of the $ 59,655 of costs stated in the settlement statement were in fact incurred by either the sales representative or its president Mr. Fenske. [3]Mr. Fenske's corporation in 1980 had no assets. In 1980, Mr. Fenske incurred a total of between $ 150 and $ 200 of expenses for stationary and for the printing os some brochures and sales contract forms. *473 Mr. Gregorcich in an invoice dated December 1, 1980, billed the partnership $ 10,000 for legal services stated to have been rendered during October through December 1980 in connection with the sales of the partnership's timeshare units. The services were stated to have involved his meetings with representatives of the partnership, the sales representative and various entities affiliated with Mr. Plunkett, as well as other services regarding sales contracts, procedures for sales, brokerage arrangements and various other matters. A handwritten notation to the invoice indicates the bill as paid on December 31, 1980. The invoice to the partnership was addressed in care of James F. Biese. The Partnership's 1980 Return, Petitioners' Individual Returns and Subsequent Bankruptcy And Criminal Convictions of the Partnership's Promoters
Timesharing Partnership on its 1980 tax return reported the following income and deductions: Income
- - Income from installment sales of units
$ 111,000
Total Income
$ 111,000
Deductions
Marketing management
$  30,000 Collection and administrative expenses
22,770 Sales commissions
788,200 Tangible marketing materials
75,000 Intangible marketing rights
70,000 Legal expenses
20,000 Amortization
83 Accounting expenses
20,000 Closing expenses
18,000 Miscellaneous expenses
11,655 Total Deductions
$ 1,055,708 Ordinary Loss
$  (944,708)
*474 Petitioners on their 1980 joint individual income tax return took a $ 60,149 ordinary loss deduction as Dr. Hartwick's distributive share of Timesharing Partnership's reported loss for the year. Petitioners on their 1980 joint individual income tax return reported $ 1,903 of ordinary income as Dr. Hartwick's distributive share of Timesharing Partnership's income for the year. On April 15, 1982, Mr. Plunkett filed a petition for relief under Chapter 11 of the Bankruptcy Code. In 1984 and 1985, Mr. Plunkett and Mr. Gregorcich, respectively, entered separate pleas of nolo contendere to numerous charges of violating Wisconsin state securities statutes relative to their promotion of Timesharing Partnership and other business and investment activities. Each received a sentence to two years of imprisonment. Respondent's Notice of Deficiency and Amended Answer
Respondent in his notice of deficiency disallowed $ 45,497 of the $ 60,149 ordinary loss deduction from Timesharing Partnership claimed by petitioners for 1980. This disallowance was based on disallowing the partnership's deductions for $ 22,770 of collection and administrative expense and $ 788,770 of collection *475 and administrative expense and $ 788,200 of sales commissions. These partnership deductions disallowed were netted against the $ 111,000 of gross receipts or sales reported by the partnership, to arrive at a disallowed partnership net loss in the amount of $ 699,970. The $ 45,497 deduction disallowed petitioners represented Dr. Hartwick's distributive share of Timesharing Partnership's disallowed net loss. In his amended answer, respondent asserts petitioners are liable for an increased deficiency in tax for 1980. The increased deficiency asserted is based on the disallowance of the remaining 1980 deductions of Timesharing Partnership, which deductions had not been disallowed when the notice of deficiency was issued to petitioners. Respondent alleged the partnership had not incurred such expenses or, alternatively, that such expenses were not incurred in an activity engaged in for profit. Also by way of an amendment to his answer, respondent asserts petitioners' deficiency for 1980 constitutes a substantial underpayment attributable to a tax motivated transaction and is subject to an increased rate of interest under section 6621(c). OPINION At issue are the 1980 deductions *476 of Timesharing Partnership and whether petitioners are subject to an increased rate of interest under section 6621(c) to the extent they are found to have underpaid their 1980 tax. Petitioners alternatively contend that they are entitled to at least a theft loss deduction for the cash Dr. Hartwick invested in the partnership. Respondent's determinations in his notice of deficiency are generally presumed correct. Petitioners bear the burden of proof and must establish that respondent's determinations in the notice are erroneous. Welch v. Helvering,290 U.S. 111 (1930); Rule 142(a). Respondent, however, does bear the burden of proof in claiming an increased deficiency or in raising a new matter. Rule 142(a). The Partnership's 1980 Deductions
Respondent contends that none of the expenses which the partnership deducted for 1980 were actually incurred. He asserts the partnership's purported purchase and resale of the 200 timeshare units was a sham. Respondent alternatively contends that even if some of the expenses were incurred in 1980, the partnership was not entitled *477 to business deductions because the expenses were not attributable to an activity engaged in for profit. Dr. Hartwick, on the other hand, while acknowledging certain expenses may not actually have been incurred in 1980, contends he is entitled to the partnership deduction he took because the partnership overall was engaged in a legitimate business venture. Dr. Hartwick as a limited partner is entitled to his 1980 deduction only if the deductions taken by Timesharing Partnership are allowable to the partnership. Under subchapter K of the Internal Revenue Code, a partnership is a tax-reporting entity. While the partnership's income or loss flows through to its partners, Timesharing Partnership's actual income or loss must first be determined. United States v. Basye,410 U.S. 441 (1973). The partnership utilized an accrual method of accounting. Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine *478 the fact of the liability and the amount thereof can be determined with reasonable certainty. Sec. 1.461-1(1)(2), Income Tax Regs.
We agree with respondent that certain expenses of the partnership were not in fact incurred in 1980 and, there fore, cannot be deducted by the partnership. As detailed in our findings, the partnership in 1980 did not sell 200 timeshare units. The 1980 resale of the units by the partnership was an entirely fictional event. None of the timeshare units listed in the sales representation agreement were sold in 1980. The sales representation agreement and the accompanying purchase guarantee agreement were executed in 1981 and backdated to 1980. Kenneth Fenske, the president of the sales representative, so testified at trial. He further related that no similar agreements or arrangements had been entered into or made in 1980. He also testified the expenses listed on the settlement statement on the purported 1980 sale of the partnership's 200 timeshare units were never incurred in 1980. Mr. Fenske's testimony was corroborated by that of Ms. Mary M. Weir. Ms. Weir in 1980 and 1981 worked as an administrative assistant for Martin *479 Gregorcich, one of the promoters. Her duties included the preparation of documents and correspondence, and she was familiar with her employer's business arrangements. Ms. Weir testified that the document were backdated to create the appearance of a 1980 sale so the partnership could claim various 1980 tax deductions. We find that Timesharing Partnership in 1980 was not entitled to deductions for sales commissions or for certain purported selling expenses. [4] These expenses were never incurred. On the evidence presented, we reach the same conclusion irrespective of whether it is petitioners or respondent who bears the burden of proof. This leaves the $ 22,700 deduction for collection and administrative expenses and certain other 1980 partnership *480 deductions which respondent did not disallow in his notice of deficiency. As to these partnership deductions not disallowed in the notice of deficiency, respondent must establish they are not deductible by the partnership. Respondent claims an increased deficiency based on the disallowance of these deductions of Dr. Hartwick's partnership. Rule 142(a). Since, as will be discussed, all of these remaining expenses were not incurred in an activity carried on for profit by the partnership, we need not decide the issues concerning whether such expenses were actually incurred or various other grounds for disallowance raised by respondent. In order to be entitled to various deductions for depreciation and expenses, Timesharing Partnership mush have been engaged in a trade or business or in the production of income within the meaning of sections 162 or 212 and 617. Timesharing Partnership was formed for the sole stated purpose of acquiring and reselling timeshare units at the Hotel on the Cay. Whether it engaged in an activity for profit depends on whether the activity was undertaken with an *481 actual and honest objective of making a profit. Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The expectation of profit need not have been a reasonable one but the activity must have been entered into, or continued, with the objective of making a profit. Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981); Engdahl v. Commissioner,72 T.C. 659, 666 (1979). The issue of profit objective must be resolved at the partnership level. Brannen v. Commissioner,722 F.2d 695, 703-704 (11th Cir. 1984), affg. 78 T.C. 471 (1982); Finoli v. Commissioner,86 T.C. 697, 721-722 (1986). Where a limited partnership is involved, the primary focus is on the actions of the general partners. Brannen v. Commissioner, 722 F.2d at n. 10 and 78 T.C. at 505; Finoli v. Commissionner, supra at 722. *482 An "activity not engaged in for profit" is defined in section 183(c) as any activity other than one for which deductions are allowable for the taxable year under section 162 or sections 212(1) or 212(2). While section 183 is actually an allowance provision, not a disallowance provision, the regulations thereunder have historically been used in facilitating the determination of the existence of the requisite profit motive. Section 1.183-2(b), Income Tax Regs., set forth nine relevant factors. No one factor is determinative in making this determination. Further, the regulations acknowledge the nine factors listed are not the only factors which may be taken into account. Nor is the determination to be made on the basis that the number of factors indicating a lack of profit objective exceed the number of factors indicating a profit objective, or vice versa.
The resolution of whether a profit motive exists is to be made on the basis off all the attenuating facts and circumstances. Elliot v. Commissioner,84 T.C. 227, 236 (1985), affd. without opinion *483 782 F.2d 1027 (3d Cir. 1986); Golanty v. Commissioner, supra at 426. Yet, more weight is to be given to objective facts than to mere self-serving statements of intent. Beck v. Commissioner,85 T.C. 557, 570, (1985); Siegel v. Commissioner,78 T.C. 659, 699 (1982). While none of Timesharing Partnership's general partners testified at trial, their actions in conducting the partnership's affairs strongly indicate the lack of a profit objective. Documents were backdated and expenses which were never actually incurred were claimed. A $ 788,200 sales commission expense was reported to be owed, despite the fact that none of the partnership's units were actually sold in 1980. [5] The upshot of these fictional expenditures was that Mr. Plunkett and Mr. Gregorcich were allowed to siphon off most of the partnership's capital. Rather than being employed for the benefit of the partnership, the cash was used to further the interests of the hotel project's promoters. Kenneth Fenske, who was the president of the corporation acting as the partnership's exclusive sales representative, testified he received only $ 16,000 in connection *484 with the resale of the partnership's 200 units. Mr. Fenske further testified that it was unclear which 200 timeshare units on apartments at the hotel the partnership owned. He stated that he became uneasy about this because he wanted people to whom he sold timeshare units to receive the units they wanted. Mr. Fenske stated that he raised this matter with Mr. Plunkett and Mr. Plunkett's associates on a number of occasions. However, the response given him was that ownership of the units among the four limited partnerships would be straightened out later, but that third party purchasers would receive the units they contracted to buy. Mr. Fenske added that the schedule of units contained in the partnership's 1980 purchase *485 agreement with Mr. Plunkett differed significantly from the schedule later attached to the subsequently executed 1981 sales representation agreement. The units listed in the 1980 schedule, he stated, were generally for more desirable weeks during the months of January, February and December. Moreover, Mr. Fenske stated that in 1980 he sold two units listed in the 1980 schedule, which were not contained in the later 1981 schedule attached to the sales representation agreement of the 200 units the partnership owned. Such state of affairs shows that not only did the general partners fail to manage the partnership is a businesslike manner, but that they were indifferent as to whether the partnership actually made a profit. The general partners either accepted or acquiesced to the assignment of less desirable timeshare units to the partnership. The evidence of record clearly establishes the partnership lacked the requisite profit objective. We find that the partnership was non engaged in a trade or business within the meaning of section 162, nor was it engaged in an activity described under sections 212(1) or 212(2). The partnership's activity was not one engaged in for profit. *486 Increased Interest Rate Under Section 6621(c)
Respondent contends petitioners under section 6621(c) (formerly section 6621(d)) [6] are liable for additional interest because their entire deficiency for 1980 is a substantial underpayment attributable to a tax motivated transaction. Since respondent asserts this addition to tax by amendment to his answer, he has the burden of proof. Zirker v. Commissioner,87 T.C. 970, 981 (1986); Parker v. Commissioner,86 T.C. 547 566 (1986); Rule 142(a). Section 6621(c) applies to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date on which section 6621(c) was enacted. Solowiejczyk v. Commissioner,85 T.C. 522 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Section 6621(c) provides for an increased rate of interest for substantial underpayments attributable to *487 a tax motivated transaction. A substantial underpayment is defined as an underpayment in excess of $ 1,000. Section 6621(c)(3)(a) generally prescribes the types of transactions which are considered "tax motivated transactions." Under section 6621(c)(3)(A)(v) a "tax motivated transaction" includes any sham of fraudulent transaction. [7] Additionally, section 6621(c)(3)(B) authorizes the Secretary by regulation to specify additional types of transactions which will be treated as tax motivated transactions. Section 301.6621-2T, Q and A-4, Temp. Proced. & Admin. Rrs., 49 Fed. Reg. 50391 (Dec. 28, 1984), states that any deductions disallowed for any period under section 183 are considered to be attributable to a tax motivated transaction. Section 301.6621-2T, Q and A-10, of the same regulation states that the increased interest rate under section 6621(c) applies to interest accruing on a deficiency after December 31, 1984, attributable to tax motivated transactions including those described in 1-4 of the regulation. *488 In his amended answer, respondent asserted the applicability of section 6621(c) because petitioners' 1980 deficiency is attributable to the disallowance of deductions to Dr. Hartwick's partnership under section 183. The amended answer, however, also makes a general prayer for relief under section 6621(c). While respondent did not specifically address the applicability of section 6621(c) in the context of sham transactions, he does make a general claim under section 6621(c). Respondent raised both the sham and section 6621(c) issues prior to trial. Petitioners thus have had a full opportunity to present any available evidence and relevant arguments concerning both issues. We, therefore, considered it appropriate here to address whether section 6621(c) also applies to a sham transaction. See Patin v. Commissioner,88 T.C. 1086, 1127-1128 (1987). We previously have found that petitioners' entire $ 60,149 ordinary loss deduction from Timesharing Partnership was subject to disallowance. We specifically found that the partnership's purported resale of 200 timeshare units never took place and that certain attendant selling expenses deducted by the partnership for *489 1980 were never incurred. Such fictitious resale was a factual sham and, therefore, a tax motivated transaction within the meaning of section 6621(c)(3)(A)(v). The balance of the partnership's claimed 1980 deductions were found to be subject to disallowance under section 183. These deductions disallowed under section 183 are attributable to a tax motivated transaction. Section 301.6621-2T, Q and A-4, Temp. Proced. & Admin. Regs. It is further clear that petitioners' underpayment for 1980 exceeds $ 1,000. We find petitioners liable under section 6621(c) for increased interest on their substantial underpayment of tax resulting from tax motivated transactions. Freytag v. Commissioner,89 T.C. 849, 886-887 (1987); Gray v. Commissioner,88 T.C. 1306 (1987); Patin v. Commissioner, supra at 1129. [8]
1980 Theft Loss
Petitioners on brief contend they are entitled to a theft loss deduction for 1980 under section 165(a) for the cash Dr. Hartwick invested in Timesharing Partnership. Respondent *490 disputes that petitioners are entitled to a theft loss deduction. Petitioners bear the burden of proving they sustained a deductible theft loss for 1980. Rule 142(a).
Section 165(a) allows as a deduction any theft loss sustained during the taxable year and not compensated for by insurance or otherwise. Under section 165(e) a theft loss is treated as sustained during the taxable year in which the taxpayer discovers the loss. Moreover, if in the year of discovery there exists a claim for reimbursement as to which there is a reasonable prospect of recovery, no loss is treated a sustained until the taxable year in which it can be ascertained with reasonable certainty that no such reimbursement will be received. Secs. 1.165-1(d)(2) and 1.165-8(a)(2), Income Tax Regs.
Petitioners have failed to meet their burden. Whether a theft occurred must be determined under the laws of the state or jurisdiction where the alleged loss was sustained. Paine v. Commissioner,63 T.C. 736, 740 (1975), *491 affd. without published opinion 523 F. 2d 1053 (5th Cir. 1975); Monteleone v. Commissioner,34 T.C. 688, 692 (1960). Whether a "theft" has occurred for purposes of section 165, is thus largely dependent on state law. Edwards v. Bromberg,232 F.2d 107-111 (5th Cir. 1956). Petitioners have not established that a theft under Wisconsin law occurred. In 1984 and 1985, the two promoters involved in the syndication of the partnership, were convicted after pleading nolo contendere to charges of violating Wisconsin securities laws. A plea of nolo contendere, however, petitioners have not established that in 1980 no reasonable prospects existed for reimbursement from the promoters or the partnership's general partners. Finally, petitioners have not shown they discovered the alleged theft in 1980 rather than in a later taxable year. Petitioners on their 1981 return reported net income from the partnership. We hold that petitioners are not entitled to a theft loss deduction for 1980. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as applicable to the taxable year in question. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. While not specifically elaborated on by the offering materials, this discussion was based on certain partnership tax provisions. Dr. Hartwick at trial recalled being told that real estate was not subject to the at-risk provisions. Sec. 704(d) allows a partner to deduct his distributive share of partnership loss only to the extent of his adjusted basis in his partnership interest. Under sec. 752(a), however, where there is an increase in a partnership liabilities, the amount of the increase is considered a contribution of money by him to the partnership. Sec. 1.752-1(a), Income Tax Regs. This results in an increase in his basis of his partnership interest. Sec. 722. Further, under sec. 752(c) where partnership property is subject to a liability and no partner is personally liable for such partnership liability, then all partners, including limited partners, share such liability in the same proportion as they share profits. Sec. 1.752-1(e), Income Tax Regs.↩
*. The discrepancy between the stated $ 300,000 total and the actual total of $ 299,500, is not explained. ↩
*. $ 540,500 attributable to sales commissions on gross sales prices and $ 88,200 attributable to additional sales commissions computed on interest charges and $ 21,655 attributable to accounts payable for legal, accounting, closing and miscellaneous expenses.↩
3. The following statement dated December 31, 1980, had also been prepared by Mr. Gregorcich:
Please pay Timesharing Vacation Ownership, Inc. for the following items incurred on behalf of Timesharing Partnership in connection with the 200 timesharing unit-weeks owned by Timesharing Partnership sold to purchasers during 1980: 1.
Legal costs incurred with Attorney Joel Holt,
title insurance companies and their
representatives and legal representatives of
prospective buyers, for sales and contractual
matters
$ 10,000
2.
Accounting and bookkeeping charges for
preparing amortization schedules, payment
forms and procedures for unit-week buyers,
funds transfer arrangements, commission
records and accounting, and use of Hotel on
the Cay accounting personnel to effectuate sales
and bookkeeping requirements
$ 20,000
3.
Closing costs incurred for the 200 unit-week
$ 18,000
4.
Miscellaneous costs incurred at The Hotel on
the Cay, St. Croix, U.S.V.I., for advertising
and promotion of Timesharing Partnership
unit-week sales, use of Hotel on the Cay
facilities and personnel in connection with
Timesharing Partnership sales
$ 11,655
$ 59,655
The statement was signed by Mr. Fenske and addressed to Timesharing Partnership, in care of James F. Biese. ↩
4. No deductions are allowable to the partnership for the following expenses claimed on its 1980 return: Sales commissions
$ 788,200
Legal expenses
10,000
Accounting expenses
20,000
Closing expenses
18,000
Miscellaneous expenses
11,655
The above expenses were listed on the December 31, 1980, settlement statement between the partnership and its sales representative. See page 14 and footnote 3, supra.↩
5. Notwithstanding the execution of the sales representation and purchase guarantee agreement in 1981, the partnership never sold 200 timeshare units. Kenneth Fenske, the sales representative's president, testified that he never sold the 200 units nor did he purchase them as required under his guarantee. The workpapers of the revenue agent who examined the partnership's returns, indicates the partnership sold no units in 1981 and only 6 units in 1982. ↩
6. Sec. 6621(d) was redesignated as sec. 6621(c)↩ by the Tax Reform Act of 1986, 100 Stat. 274. See Pub. L. 99-514, sec. 1511(c)(1)(A)-(C). 7. Pub. L. 99-514, 100 Stat. 2085, 2750, sec. 1535, retroactively amended the statute to add sham or fraudulent transactions to the list of tax motivated transactions. This amendment is effective with respect to interest accruing after December 31, 1984, the original effective date of sec. 6621(c). The amendment, however, will not apply to any underpayment as to which there was a final court decision. The legislative history states that it would otherwise be anomalous to subject genuine transactions under certain circumstances to a higher interest rate, yet allow a sham transaction, which is much more abusive, to escape the higher rate simply because it is a sham. H. Rept. 99-841 (Conf.) (1086), 99th Cong., 2d Sess. (1986), 1986-3 C.B. (Vol. 4) 1, 795-796. See DeMartino v. Commissioner,88 T.C. 583, 586↩ (1987). 8. Chellappan v. Commissioner,T.C. Memo. 1988-208; AilloniCharas v. Commissioner,T.C. Memo. 1988-83↩.