T.C. Memo. 1996-473

UNITED STATES TAX COURT

JOSEPH B. LEONARD AND DOROTHY A. COLE LEONARD, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 16749-91,                    Filed October 22, 1996.
           10399-93.

<u>C. A. Teklinski</u>, for petitioners.

<u>Thomas A. Dombrowski</u> and <u>Valerie N. Larson</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, <u>Judge</u>:  By separate notices of deficiency, respondent determined the following with regard to petitioners' Federal income taxes:

| | | Additions to Tax | | | Accuracy-Related Penalty |
|------|------------|-----------|----------------|-----------|-----------|
| <u>Year</u> | <u>Deficiency</u> | <u>Sec. 6651</u> | <u>Sec. 6653(a)(1)</u> | <u>Sec. 6661</u> | <u>Sec. 6662(a)</u> |
| 1988 | $61,855 | $6,222.91 | $3,385.70 | $15,463.75 | --- |
| 1989 | 52,532 | --- | --- | --- | $10,506 |

Following concessions by the parties,[1] the issues for decision are:

(1) Whether petitioners are entitled to a claimed $650,000 theft loss in 1985 that would permit them a net operating loss carryover deduction in 1988. We hold that petitioners are not entitled to the claimed theft loss in 1985.

(2) Whether petitioners are liable for the addition to tax under section 6653(a)(1) for 1988. We hold that petitioners are so liable.

(3) Whether petitioners are liable for the addition to tax under section 6661 for 1988. We hold that petitioners are so liable.

(4) Whether petitioners are liable for the accuracy-related penalty under section 6662 (a) for 1989. We hold that petitioners are so liable.

All section references are to the Internal Revenue Code for the years under consideration. All Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Background

Petitioners, husband and wife, resided in Escondido,

---

[1] Respondent has conceded that petitioners are not liable for the sec. 6651 addition to tax for 1988. Petitioners have conceded the deficiency for 1989.

California, at the time they filed their petitions.

Dorothy Cole Leonard (Mrs. Leonard) worked as a legal secretary for approximately 15 years before attending, and graduating from, Western State University College of Law. She was admitted to the California bar in 1974. In her law practice she specializes in trust and estate matters. Joseph B. Leonard (Mr. Leonard) also is an attorney. He was admitted to the California bar in 1972, and has worked in the area of trusts and estates for a corporate trust department.

Petitioners were married in 1978. Mr. Leonard has a daughter, Suzette, from a prior marriage. Suzette married Robert Gindt (Robert) in 1977. Robert and Suzette filed for a Chapter 7 bankruptcy in 1981. Robert had been employed in several positions, including working in floral shops operated by his mother and his aunt.

In late 1981 or early 1982, Robert became a stockbroker and thereafter participated in a variety of investment transactions. From 1981 to 1983, he was involved in a business venture with Katherine Gatto, a friend, to renovate commercial property in Berkeley, California, that was owned by Ms. Gatto and housed the University Flower Shop.

Robert and Suzette's residence was rented from Ms. Gatto. Robert had hoped that he and Suzette could purchase their residence with profits generated from the flower shop venture, but that venture was not financially successful.

Bank Loans

On July 9, 1982, Mrs. Leonard obtained a 2-month bank loan for $75,000 and provided the proceeds therefrom to Robert in order that he could pay off mechanic's liens on the flower shop property. Mrs. Leonard did this as a favor to Robert. However, she expected Robert to be responsible for the repayment of principal and interest charged her by the bank.

Robert repaid only a portion of the $75,000 given him by Mrs. Leonard. One of Robert's checks to her, dated September 10, 1982, bounced. Mrs. Leonard was ultimately required to pay off the balance of the $75,000 loan.

Between February and April of 1983, Mrs. Leonard opened four joint bank accounts with Robert in order that he could "have access" to the money. Mrs. Leonard placed no restrictions on how Robert could use the bank account funds. No documentation was prepared to define their relationship. All bank statements were sent to Mrs. Leonard; the statements revealed a number of overdrafts that began in February 1983. In addition to the four joint accounts with Robert, Mrs. Leonard had 12 bank accounts and a number of trust accounts during 1983. Between February and May 1983, she obtained loans at four banks totaling $200,000, ostensibly for use in her law practice, but in fact, the money was provided to Robert.

Unsupervised Investments

During 1983, checks totaling more than $1.3 million were written to Prudential Bache--where Robert was a stockbroker--on one

of Mrs. Leonard's joint accounts with Robert.  The money was used by Robert to make investments in his own name.  He intended to repay the principal to Mrs. Leonard and retain all investment earnings for himself.

Mrs. Leonard gave no thought as to how Robert was investing the money she gave him.  Robert told Mrs. Leonard that he was using the money from her accounts to complete the flower shop project in Berkeley, to purchase factoring invoices, and to purchase properties in Danville, California.  Robert lost money on the investments he made, including approximately $340,000 in the factoring transactions.

Mr. Leonard gave Robert $74,000 in May 1983 in order that he could make a downpayment for the purchase of property located in Danville, California (Willow Creek property).  Altogether Robert obtained approximately $270,000 from family and friends to make the downpayment on the $1.4 million purchase for the Willow Creek property.  Mr. Leonard did not expect to receive an interest in the property, and he did not require any documentation relating to the transaction.  Robert intended to repay Mr. Leonard with proceeds from the anticipated sale of the Willow Creek property.  The sale fell through, and foreclosure proceedings were commenced in late 1983.

Petitioners ultimately learned in October 1983 that title to both the Willow Creek property and Robert's residence was held by Katherine Gatto.

Access to Funds Terminated

In July of 1983, petitioners discontinued their transactions with Robert when they learned that he might not be able to repay them. In the fall of that year, petitioners learned that Robert no longer worked at Prudential Bache.

Petitioners never attempted to obtain a note from Robert. They did not contact Katherine Gatto to learn about her business dealings with Robert. Nor did petitioners file a civil action against Robert or contact authorities about any possible crime.

Indictment

In early 1984, Robert told petitioners that he and Suzette were under criminal investigation related to banking activities. At the request of Robert and Suzette, petitioners provided Suzette with money to pay her attorney's fees. On November 9, 1984, Robert and Suzette were indicted on bank larceny and conspiracy charges concerning transactions that occurred beginning July 14, 1983, at the Mechanics Bank in Richmond, California. Although the indictment against Robert and Suzette did not involve any transaction with petitioners, Mrs. Leonard was notified that some of her account records were subpoenaed with respect to the investigation. On February 21, 1985, Robert pleaded guilty to bank larceny. The indictment against Suzette was eventually dismissed.

By early 1984, petitioners were aware that Robert and Suzette had little money, that they were selling their personal property, that they had borrowed money from Robert's parents, and that their residence and the Willow Creek property were in foreclosure.

Robert and Suzette were evicted from their residence in June 1984, and at that time they were unemployed. By November 1984, their only asset was a 1973 Chevrolet automobile, and their only source of funds came from family members. By the end of 1984, petitioners had been informed by Robert that he and Suzette had no money and petitioners had no reason to believe that Robert would be able to repay them.

Accountant's Advice

Clyde N. Freeman, a certified public accountant, prepared petitioners' tax returns from 1983 through 1987. Mrs. Leonard typically reviewed major items in the returns for errors and personally typed the returns. Freeman knew about the transactions with Robert. Petitioners presented all information about the transactions with Robert to Freeman when their 1985 return was being prepared. Freeman advised petitioners that a loss with respect to those transactions should not be claimed, and that he believed if a deduction for the losses incurred were to be taken, the deduction would be disallowed because of the family relationships involved. Petitioners did not claim a loss with respect to their transactions with Robert on their 1983, 1984, or 1985 returns.

In April 1989, just before the period of limitations for 1985 was to expire, petitioners filed an amended return for 1985 claiming a $650,000 "embezzlement loss" arising from their transactions with Robert in 1983. The amended return was prepared by Betty White, another accountant, with Freeman's assistance.

White advised petitioners that a theft deduction was appropriate.

In October 1989, petitioners filed amended returns for 1986 and 1987.  They claimed a net operating loss carryover (from 1985) of $578,944 in 1986 and $445,504 in 1987.  On their 1988 return, petitioners claimed a net operating loss carryover from 1987 of $640,600.  Their 1988 return overstated the claimed net operating loss carryover from 1987 by approximately $316,400.[2]

Petitioners did not file an election to relinquish the carryback period with respect to the claimed net operating loss pursuant to sec. 172(b)(3)(C) with their 1985 income tax return or on their amended 1985 income tax return.  By letter dated August 2, 1993, petitioners submitted a request for relief under Rev. Proc. 92-85, 1992-2 C.B. 490, seeking an extension of time to make an election under sec. 172(b)(3) to relinquish the carryback period with respect to the claimed net operating loss.  On May 27, 1994, respondent ruled that petitioners were not eligible for the relief sought.  Petitioners did not appeal respondent's ruling.

OPINION

Issue 1.  Theft Loss

Petitioners' entitlement to a net operating loss carryover depends upon the characterization of their transactions with

---

[2]    The arithmetical computation for the overstatement of the net operating loss carryover is as follows:

| | | |
|---|---|---|
| NOL carryover reported on 1988 return | | $640,600 |
| NOL carryover reported on 1987 return | $445,500 | |
| NOL carryover used on 1987 return | 121,300 | |
| Unused NOL carryover from 1987 | | 324,200 |
| Overstatement of carryover on 1988 return | | **$316,400** |

Robert. Petitioners contend that Robert embezzled money from them, and as a result thereof, they sustained a $650,000 theft loss in 1985 that would entitle them to a net operating loss carryover deduction in 1988. Respondent contends that petitioners provided money to Robert to assist him and Suzette, and that petitioners knew at least by 1984 that the money would not be repaid.[3]

Individual taxpayers may deduct certain losses, including theft losses, sustained during the taxable year and not compensated for by insurance or otherwise. Sec. 165(a), (c)(3). A theft loss is deductible in the year in-which the taxpayer discovers the loss. Sec. 165(e). Petitioners have the burden of proving a theft loss. Rule 142(a); Malik v. Commissioner, T.C. Memo. 1995-204.

The term "theft" includes embezzlement. Sec. 1.165-8(d), Income Tax Regs. Whether a theft occurred depends on the law of the State where the loss was sustained. Paine v. Commissioner, 63 T.C. 736, 740 (1975), affd. without published opinion 523 F.2d 1053 (5th Cir. 1975). Under California law, a person commits theft if he "shall fraudulently appropriate property which has been entrusted to him, or * * * shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other

---

[3] Petitioners did not contend, even in the alternative, that their losses should be characterized as losses from a business or nonbusiness bad debt. On the other hand, respondent asserts, in her posttrial brief, that if petitioners sustained a loss, it was a capital loss or a bad debt loss. In this regard, we are aware that a loss from a theft can generate a net operating loss carryback and carryover, whereas a loss from a nonbusiness bad debt is treated as a short-term capital loss, and its use for carryback and carryover purposes is restricted by sec. 172(d)(4). See United States v. Generes, 405 U.S. 93, 95-96 (1972).

person of money".  Cal. Pen. Code sec. 484 (West 1988).

Petitioners claim that Robert advised Mrs. Leonard that by having access to and using lines of credit he would be able to make profitable investments in his capacity as a stockbroker with Prudential Bache.  Petitioners contend that Robert obtained the money under false pretenses because he did not invest the money on Mrs. Leonard's behalf, but rather, intended to repay her only the principal.  Petitioners posit that Robert made the offer because prior to 1983, Mrs. Leonard "was experiencing personal financial difficulties due to outstanding obligations which she had incurred from her schooling and opening her private law practice".

The evidence shows that it was Robert, not Mrs. Leonard, who was having financial difficulties.  Mrs. Leonard prepared a personal financial statement in July 1982 that listed total liabilities of only $33,400.  In 1981 petitioners' gross income was $77,671, and in 1982 it was $73,026.  Petitioners had a gross income of nearly $120,000 in 1983.  We believe it unlikely that Mrs. Leonard could have obtained $200,000 in bank credit, half of which was unsecured, if she were experiencing financial difficulties.  On the other hand, Robert and Suzette did have financial difficulties; they filed for bankruptcy in 1981.

In 1982, Mrs. Leonard obtained a 2-month, $75,000 bank loan and provided the proceeds to Robert in order that he could clear mechanic's liens on the flower shop property, which he was developing.  Mrs. Leonard admitted that she did not expect to make money on the transaction.  After Robert's check to repay the bank

loan did not clear, Mrs. Leonard obtained an extension of the loan. Robert later repaid only a portion of the loan, and Mrs. Leonard was required to make up the difference.

We believe the understanding between Mrs. Leonard and Robert in the 1983 transactions was similar to their treatment of the initial $75,000 loan in 1982. While Mrs. Leonard expected the return of her money, and while she might have expected some sort of financial benefit if Robert had success with his investments, her primary purpose in providing the money was to benefit Robert and Suzette. In essence, the moneys advanced to Robert were noninterest-bearing loans. Indeed, petitioners stated on their 1983 return that the purpose of the various loans was "to assist family members with financial difficulties; hence, funds were not used to acquire investment property or other assets".

In our opinion, the financial arrangement between petitioners and Robert did not give rise to a theft. As parents, petitioners wanted to assist their children. In summary, we conclude that the funds were loaned to Robert without the expectation of petitioners' realizing a profit. Accordingly, petitioners are not entitled to a $650,000 theft loss in 1985,[4] and thus are not entitled to a carryover for 1988.

---

[4] Even assuming, arguendo, that the financial arrangement between Robert and petitioners gave rise to a theft loss, petitioners failed to show that they discovered the loss in 1985. Indeed, the record clearly shows that petitioners knew of the loss by the end of 1984.

Issue 2.  Negligence

The second issue is whether petitioners are liable for the addition to tax for negligence under section 6653(a)(1) for 1988. Petitioners dispute the negligence addition to tax claiming they are not knowledgeable about tax matters and relied on an accountant.  We disagree.  Freeman, the accountant who prepared the original returns for petitioners, knew all of the facts surrounding the transactions with Robert and informed petitioners that the losses never could be deducted.  Not satisfied with Freeman's advice, petitioners later went to accountant White who advised petitioners that the loss could be claimed.

Section 6653(a)(1) provides that if any part of an underpayment of tax is the result of negligence or intentional disregard of rules or regulations, 5 percent of the underpayment is added to the tax.  Negligence is defined as the failure to exercise the due care that a reasonable, prudent person would exercise under similar circumstances. Zmuda v.  Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982);  Neely v.  Commissioner, 85 T.C.  934, 947 (1985).  Reliance on professional advice, by itself, is not an absolute defense to negligence.  A taxpayer first must demonstrate that his reliance was reasonable.  Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).

Petitioners--both experienced attorneys--undoubtedly took a keen interest in a possible deduction of the magnitude involved in this case.  Freeman advised petitioners against taking a theft

loss, and petitioners did not take the loss on their original 1985 tax return. We are not convinced that petitioners' subsequent "reliance" on White's advice was reasonable.

Petitioners obviously knew prior to 1985 that they would not recover the money they transferred to Robert. Thus, even assuming arguendo, that petitioners sustained a theft loss as a result of their transactions with Robert, it is clear that petitioners' attempt to take the loss for 1985 was improper. We reach this conclusion, in part, because by the end of 1984, petitioners knew that Robert and Suzette had. no money, were unemployed, and ,had no ability to repay them. In our opinion, petitioners claimed the deduction in 1985 because the period of limitations had closed on their 1983 and 1984 returns.

Petitioners stated on their 1983 return that the large increase in the deduction for interest expense was because of money borrowed "to assist family members with financial difficulties," and that the funds "were not used to acquire investment property or other assets". They did not change their position when filing returns in later years, including the years in issue. At trial, however, they maintained that money was borrowed from banks by Mrs. Leonard because she was having financial difficulties, and that the funds were invested by Robert so that she could repay her debts. We do not accept as credible petitioners' testimony in this regard.

Moreover, the claimed deduction was clearly inflated. The initial deduction taken in 1985 was for $650,000, although at trial petitioners were unable to prove that they lost that much. On

their 1988 return, petitioners claimed a net operating loss carryover from 1987 of $640,600, almost as much as was originally claimed on the amended 1985 return. The claimed carryover was overstated by about $316,400.

We hold that petitioners were negligent and intentionally disregarded rules or regulations in claiming the "embezzlement loss", and that they are liable for the addition to tax under section 6653(a)(1) for 1988.

Issue 3.   Substantial Understatement

Section 6661, applicable to 1988, imposes an addition to tax of 25 percent of the amount of any underpayment that results from a substantial understatement of tax. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown or $5,000. Sec. 6661(b)(1)(A).

Petitioners reported a tax liability of $5,859 for 1988. They had about $240,000 in income that year, and their correct tax liability would have been much larger than reported. We hold that petitioners have failed to carry their burden of showing that they are not liable for the addition to tax under section 6661 for 1988.

Issue 4.   Accuracy-Related Penalty

Section 6662(a), applicable to 1989, imposes a penalty of 20 percent of the underpayment attributable to negligence or substantial understatement of tax. Sec. 6662(a), (b)(1) and (2). As previously found, petitioners were negligent and substantially understated their tax for 1988 by claiming a carryover with respect to the alleged theft loss in 1985. They also were negligent and

substantially understated their tax for 1989 by claiming a carryover from the same alleged loss.

Petitioners conceded the deduction for 1989 because the carryover loss had been fully utilized prior thereto[5]. We have sustained respondent's determination that petitioners are liable for the section 6653(a)(1) and section 6661 addition to tax for 1988. We likewise sustain respondent's determination that petitioners are liable for the accuracy-related penalty under section 6662(a) for 1989.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155.</u>

---

[5] Petitioners had failed to file an election to relinquish the carryback pursuant to sec. 172(b)(3)(C). See discussion <u>supra</u>, p. 8.